**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IRENA K. MAUSNER, individually and as trustee of the Irena K. Mausner Revocable Trust U/A/D May 16, 2022, | Case No.: 23-cv-994 |
| Plaintiff, | Jury Trial Demanded |
| v. | |
| IAN O. MAUSNER, | |
| Defendant. | |

## COMPLAINT

Plaintiff Irena K. Mausner ("Plaintiff" or "Dr. Mausner"), individually and as trustee of the Irena K. Mausner Revocable Trust U/A/D May 16, 2022 (the "Trust"), by and through her undersigned attorneys, hereby brings this Complaint against Defendant Ian O. Mausner ("Defendant" or "Ian Mausner") and alleges as follows:

## NATURE OF THE ACTION

1.     Dr. Mausner, an 87-year-old Holocaust survivor who went on to raise a family and become a prominent prosthodontist in New York City, regrettably brings this action against her adult son Ian Mausner, who has engaged in a scheme to defraud his mother through a course of fraud, conversion, breach of fiduciary duty, and other improper conduct designed to siphon money and property from his mother for his personal use and enjoyment.

2.     Until recently, Defendant acted as a financial adviser to Plaintiff, and, in that role and as her son, he was in a position of trust vis-à-vis his mother and owed her fiduciary duties to act in her best interest.  Defendant violated those duties by engaging in a pattern of fraud, deceit,

conversion, and self-dealing.  Even after Plaintiff terminated Defendant's role as a financial adviser, he continued to owe her fiduciary duties, including in his role as a tenant-in-common with his mother in connection with two parcels of real estate in California.  Defendant violated his fiduciary duties through further acts of fraud and deceit practiced upon his mother.

3.     Defendant's victimization of his own mother has involved, among others acts: (a) tricking his mother into believing that more than $1.7 million of her money was invested in a trading account held in her name, when, in fact, Defendant had transferred the funds into a trading account in his name; (b) transferring $100,000 from his mother's individual retirement account ("IRA") into an account that he controlled without her authorization or consent; (c) stealing his mother's identity to sell her stock and convert the proceeds and to open a credit card in her name and incur thousands of dollars of expenses; (d) stealing his mother's long-term care insurance payments; and (e) forging his mother's signature on deeds so that he could fraudulently convey her interest in two parcels of real estate to himself.

4.     Between May 2018 and February 2022, while serving in his capacity as Plaintiff's adviser on financial affairs and investments, Defendant transferred at least $1.7 million from Plaintiff's accounts to a brokerage account at Robinhood Markets, Inc. ("Robinhood," and the account, "Robinhood Account A").  Although Defendant had led Plaintiff to believe that Robinhood Account A was held in Plaintiff's name, Defendant had, in fact, opened the account in his own name and has always exercised dominion and control over the account.  Plaintiff did not authorize Defendant to transfer her assets into a Robinhood account in Defendant's name.

5.     On or about January 5, 2022, without Plaintiff's knowledge or consent, Defendant transferred $100,000 from Plaintiff's IRA at JPMorgan Chase ("JPM") into an account at Wells Fargo that he owns and controls.

6.      Shockingly, after Dr. Mausner discovered her son's fraud and sought to end her victimization at his hands, Defendant castigated her, writing that her conduct was "truly reprehensible and unforgivable," and adding that, "[y]ou asked me why God has done this to you (referring to your stroke and cancer) and perhaps we now know why."  Since then, Defendant has continued his course of fraud and theft from his mother.  His actions have become more troubling with the passage of time, including an array of theft, fraud, and deceit, combined with his confronting his elderly mother while she was in a medical rehabilitation facility and threatening his sister.  Defendant's conduct is illegal and is nothing short of outrageous.

7.      For instance, in or about May 2022, Defendant opened a credit card account in Plaintiff's name without her knowledge or authorization and then used that credit card to run up purchases of over $13,000.

8.      In or about June 2022, without Plaintiff's knowledge or consent, Defendant caused a stock transfer agent to sell his mother's shares of Colgate-Palmolive and send a check for $50,375.80, representing the proceeds of the stock sale, to Defendant's address in San Diego, California.  He then negotiated the check through an account at Wells Fargo Bank, N.A. ("Wells Fargo") that he had fraudulently opened in his and Plaintiff's name without Plaintiff's knowledge or consent (the "Fraudulent Wells Fargo Account").  Defendant promptly withdrew the money from the Fraudulent Wells Fargo Account, spent a portion of it to fund his high-end lifestyle, and transferred the remainder to other accounts in his name.

9.      In or about August 2022, Defendant executed phony deeds purportedly transferring Plaintiff's ownership interest in two parcels of California real estate to himself by forging Plaintiff's signature and causing the deeds to be fraudulently notarized and recorded.

10.     In or about September 2022, without Plaintiff's knowledge or consent, Defendant submitted a United States Postal Service ("USPS") change-of-address form in which Defendant falsely represented that Plaintiff had changed her address from New York County, New York, to his address in San Diego, California.  As a result of this unauthorized change of address, Defendant was able to steal two checks made payable to Plaintiff by her long-term care insurer, Continental Casualty Company ("Continental").  He deposited the checks into the Fraudulent Wells Fargo Account and then transferred the funds to other Wells Fargo accounts that he owns or controls.

11.     Plaintiff has repeatedly sought an accounting of her assets from Defendant.  In response, Defendant has obfuscated, provided shifting stories, and has consistently refused to produce complete documentation accounting for the whereabouts of his mother's money and other assets despite repeated requests that he do so.

12.     Defendant's actions violated the fiduciary duties of good faith, loyalty, and due care that he owed to Plaintiff, and reflect an ongoing course of fraud, deception, self-dealing, and conversion of Plaintiff's assets.  Defendant's misconduct has gone unchecked, and Plaintiff brings this action (a) to determine where her assets are, (b) for damages against Defendant, including punitive damages, and (c) for an injunction prohibiting Defendant from stealing Plaintiff's identity and disposing of any of her assets, including funds currently held in escrow as a result of the sale of a parcel of real estate in San Diego, California.

## PARTIES, JURISDICTION, AND VENUE

13.     Plaintiff is an 87-year-old woman who resides in Manhattan, New York.

14.     Plaintiff is the trustee of the Trust, which is organized under the laws of the State of New York.  As trustee of the Trust, Plaintiff is empowered to hold, manage, and dispose of the Trust's assets.

15.     Defendant is Plaintiff's 62-year-old son who resides in San Diego, California.

16.     Upon information and belief, Defendant derives substantial revenue from interstate and/or international commerce.  Among other things, he holds himself out as being involved in multiple businesses—including a capital management and financial advisory services firm, a cryptocurrency fund, and a divorce and relationship consulting firm—and, upon information and belief, he has met with clients both abroad and in multiple U.S. states, including New York. Additionally, he self-published a book concerning post-divorce relationships, which is sold on Amazon.com, a company that sells books and other products in international and interstate commerce.  Finally, upon information and belief, Defendant held an interest in a California-based vitamin company, which sells its products nationwide, that was acquired by a multi-national consumer goods company and, as a result of this transaction, had a significant liquidity event.

17.     Defendant has engaged in tortious acts in New York, and has engaged in other conduct that has caused consequences to Plaintiff in New York, where she resides.  Defendant knows that Plaintiff resides in New York and therefore that his actions, regardless of where they are committed, will affect her in New York.

18.     The Court has jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.

19.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because it is a judicial district in which Plaintiff lives and where a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

**BACKGROUND**

20.     Until 2018, Plaintiff ran a prosthodontic practice in New York City.  She sold her practice in 2018, continued working for just under a year, and retired in 2019.

21.     Plaintiff's late husband, Defendant's father, was an executive for a major cosmetics company.  Together, Plaintiff and her late husband acquired a substantial portfolio of assets.

22.     Defendant was a registered investment adviser for years, operating through his company J.S. Oliver Capital Management, L.P. ("J.S. Oliver").   Defendant held a number of securities licenses governed by the Financial Industry Regulatory Authority ("FINRA") and was a registered representative of several broker dealers.   Defendant and J.S. Oliver were charged by the U.S. Securities and Exchange Commission ("SEC") with a variety of securities laws violations based on a fraudulent "cherry-picking" scheme and Defendant's misuse of soft-dollar credits.   In 2019, Defendant and J.S. Oliver agreed to resolve the matter with the SEC.   Consequently, Defendant was ordered to disgorge approximately $669,965.00 and was barred from serving in various investment adviser capacities, among other things.

23.     For years, in addition to being in a position of trust and confidence as her son, Defendant acted as a financial adviser to Plaintiff.   He continued to advise Plaintiff even after his SEC bar.   In or about March 2022, Plaintiff terminated Defendant's role as her financial adviser.

24.     As Plaintiff's adviser, Defendant was familiar with Plaintiff's bank and brokerage accounts and, when authorized, interacted with those institutions' representatives on Plaintiff's behalf.

25.     When authorized, Defendant would, among other things, cause money to be transferred between accounts and cause trades to be executed on Plaintiff's behalf.

26.     Defendant routinely discussed the advisability of particular investments with Plaintiff and made recommendations to her.

27.     As Plaintiff's adviser and son, whom Plaintiff trusted in connection with her financial affairs, Defendant owed Plaintiff fiduciary duties.   While Defendant was advising Plaintiff, she believed that he always acted in a manner consistent with his fiduciary duties to her and in her best interests.

28.     In or about March 2022, Plaintiff caused a review of various financial transactions in her accounts to be conducted and discovered certain irregularities relating to Defendant's actions vis-à-vis her financial affairs.  Plaintiff thereafter sought an accounting from Defendant regarding her assets, but Defendant has refused to provide a full accounting of the whereabouts and status of her assets.

29.     Plaintiff has terminated her advisory relationship and relationship of trust with Defendant and, on multiple occasions, has informed him that he is not authorized to act in her name or on her behalf.  Defendant has ignored those instructions by using Plaintiff's name, on multiple occasions, to steal her assets and obtain other personal benefits.

## DEFENDANT HAS NO AUTHORITY TO ACT ON PLAINTIFF'S BEHALF AND HAS REFUSED TO ACCOUNT FOR PLAINTIFF'S ASSETS

30.     Defendant has no authority to act on Plaintiff's behalf.

31.     Plaintiff has repeatedly informed Defendant that he is not authorized to take any action on her behalf.  For example, on or about May 2, 2022, Plaintiff caused the following instruction to be given to Defendant:

> [P]lease be advised that you have no authority or authorization to act in the name of or on behalf of Irena Mausner. This restriction prohibits you from, among other actions, engaging in any transactions, transfers, or other financial activity in the name of or on behalf of Irena Mausner in any form or manner. To this end, you are directed to cease and desist from any further activity, including, but not limited to, any attempts to mortgage property, transfer funds, make payments, or incur debts or other obligations of any kind on Irena Mausner's behalf.

32.     Plaintiff has repeatedly requested that Defendant provide an accounting of Plaintiff's assets by supplying documents and other information concerning the status and whereabouts of her assets.

33.     For example, on or about May 2, 2022, Plaintiff caused the following demand to be made of Defendant:

> [W]e would ask that you promptly produce to us all materials, communications, and information relating to Irena Mausner in your possession, custody, or control, including, but not limited to, those relating to or concerning any and all accounts (including all passwords and account information to access electronic accounts), assets, correspondence, funds, loans, liens, mortgage applications, mortgages, notes, payments, property, property records, completed or contemplated transactions, transfers, trusts, and obligations of any nature relating in any way to Irena Mausner. Further, we request that you identify any entities or individuals who have or have had any role, whether formal or informal, in managing, controlling, or acting as trustee or fiduciary for Irena Mausner or who hold or have held any interest in any way related to Irena Mausner.

34.     To date, Defendant has failed to provide a comprehensive accounting of the current status and whereabouts of Plaintiff's assets.

## DEFENDANT'S FRAUD AND CONVERSION USING THE ROBINHOOD ACCOUNTS

35.     As part of his scheme to defraud Plaintiff and convert her assets to his own use, Defendant opened Robinhood Account A in his own name and used Plaintiff's money to fund it. Specifically, beginning in May 2018, Defendant began a course of conduct designed to gain control over and convert Plaintiff's assets by causing substantial amounts of money to be transferred from Plaintiff's bank accounts into Robinhood Account A.  Defendant led his mother to believe that the money in the account was hers and that the account was in her name and subject to her control.  In furtherance of this fiction, Defendant covered up the fact that he used Plaintiff's money to fund an account that actually was in his name by supplying his mother with a fictitious account statement falsely reflecting that the account was in Plaintiff's name.

36.     Between in or about May 2018 and February 22, 2022, in dozens of discrete, identifiable transactions, Defendant caused more than $1.7 million dollars to be transferred from Plaintiff's bank accounts into Robinhood Account A.

37.     In or about February 2022, Plaintiff was in the hospital recovering from a significant health-related issue.  Defendant nevertheless continued to transfer her money into Robinhood Account A, without her knowledge or consent, over the course of several weeks after Plaintiff's hospitalization.  During that period alone, Defendant caused at least $150,000 to be transferred from Plaintiff's bank accounts into Robinhood Account A, without her authorization or consent.  After Plaintiff learned of these unauthorized transfers and confronted Defendant, Defendant agreed to reverse them.

38.     During the course of his actions transferring Plaintiff's money into Robinhood Account A, Defendant lied to Plaintiff about who the true owner of Robinhood Account A was. Most strikingly, on or about February 16, 2020, Defendant sent Plaintiff an email attaching a document purporting to be a Robinhood account statement for Robinhood Account A (the "Phony Account Statement").  This document stated that Robinhood Account A was an "Irena Mausner Account" even though Robinhood Account A is not in Plaintiff's name.  The Phony Account Statement also indicated that, as of December 31, 2019, the portfolio balance in Robinhood Account A was $166,007.

39.     Robinhood has confirmed that the Phony Account Statement is not an authentic Robinhood document.  Robinhood has also confirmed that Robinhood Account A is not and never was in Plaintiff's name.

40.     Upon information and belief, Robinhood Account A is in Defendant's name, and it is owned and controlled by Defendant.

41.     Notwithstanding Plaintiff's requests for an accounting of Robinhood Account A, Defendant has provided no documentation concerning the account, claiming that the reason he cannot do so is because he was locked out of the account through the actions of Plaintiff's

representatives.  Defendant did not even produce a copy of the Phony Account Statement that he sent to his mother on or about February 16, 2020.

42.    Defendant's other statements concerning Robinhood reflect the extent of his attempts to deceive and manipulate Plaintiff, as well as the purposeful nature of those efforts.

43.    On or about April 19, 2021, in connection with a meeting that Plaintiff was scheduled to have with one of her bankers, Defendant instructed her, via text message, to "[j]ust say yes to everything they ask" and to "[j]ust say you are aware of course of the transfers to Robinhood."

44.    In or about October 2021, Defendant participated in an email exchange with Plaintiff's accountant concerning transfers from Plaintiff's bank accounts to various investment accounts.  In response to the accountant's questions about Plaintiff's investment accounts, Defendant did not disclose the funds in Robinhood Account A.

45.    On or about November 26, 2021, Plaintiff asked Defendant to purchase certain publicly traded equity securities for her account.  At that time, she had the following exchange via text message with Defendant concerning her funds at Robinhood:

> **Plaintiff:** Where are you taking the money from?
> **Defendant:** Robinhood
> **Plaintiff:** [Plaintiff's Personal Banker] [told me] we have money in Robinhood and Cypto [sic] ??? how much?
> **Defendant:** Approx $250k in crypto and approx $1mm in Robinhood

46.    Defendant told Plaintiff that there was "approx $1mm in Robinhood" despite the fact that Robinhood Account A was not and never was in Plaintiff's name.  Moreover, as discussed below, the only other Robinhood account relevant here was an account that was opened in Plaintiff's name, but only $35,000 ever went into that account, and, upon information and belief, Defendant promptly transferred all of that money to a Wells Fargo account that he controlled.

47.     Defendant has since given shifting stories on what happened to the money that he transferred into Robinhood Account A.  His first explanation was that Plaintiff had authorized a variety of payments and made a number of investments in private companies.

48.     More recently, he claimed that he "did some additional research and the entirety of over $2.1mm was lost to investment losses at Robinhood."

49.     Despite Plaintiff's repeated requests, Defendant has not provided documentation substantiating his statements, nor has he provided information concerning the specific securities underlying this approximately $2.1 million in purported "investment losses."  In short, Defendant has refused to account for Plaintiff's funds that went into Robinhood Account A, and he has simply attempted to cover for his clearly fraudulent scheme and course of conduct.

50.     As a separate component of his scheme to defraud his mother, upon information and belief, Defendant opened a second account at Robinhood ("Robinhood Account B"), which was in Plaintiff's name.

51.     In or about November 2019, upon information and belief, Defendant established Robinhood Account B in her name and caused it to be funded with a $35,000 transfer from one of Plaintiff's bank accounts.  The $35,000 was never used to purchase any securities on Plaintiff's behalf.  Upon information and belief, Defendant then took that $35,000 and used it for his own purposes.  Specifically, on or about December 17, 2019, Defendant caused the $35,000 that had been transferred into Robinhood Account B to be transferred out of the account.  Upon information and belief, the $35,000 was transferred to a bank account owned or controlled by Defendant.

52.     There has been no activity in Robinhood Account B since December 2019.

### DEFENDANT'S THEFT OF $100,000 FROM PLAINTIFF'S IRA

53.     As a further part of his scheme to defraud his mother and steal her assets, Defendant stole $100,000 from his mother's IRA account at JPM.

54.    Specifically, in or about November 2020, Plaintiff opened an IRA at JPM.

55.    On or about January 5, 2022, without Plaintiff's authorization or consent, and while still acting as a financial adviser to Plaintiff, Defendant transferred, or caused to be transferred, $100,000 from Plaintiff's IRA at JPM to an account at Wells Fargo.

56.    The transfer delivery instructions indicate that the Wells Fargo account into which the funds were paid was named "Irena K. Mausner IRA." The account, however, does not belong to Plaintiff, nor did she authorize Defendant to open or maintain it for her benefit.

57.    Upon information and belief, the Wells Fargo account into which the $100,000 was transferred is owned and controlled by Defendant, and he referred to it as being in the name "Irena K. Mausner IRA" in an attempt to avoid detection.

## DEFENDANT'S FRAUDULENT OPENING AND USE OF A CAPITAL ONE CREDIT CARD ACCOUNT IN PLAINTIFF'S NAME

58.    As a further part of Defendant's scheme to defraud his mother and benefit himself at her expense through whatever means possible, Defendant opened a credit card account in her name without her knowledge or consent and promptly charged over $13,000 to the account in less than a month.

59.    Specifically, upon information and belief, on or about May 21, 2022, Defendant opened a Capital One flexible spending credit card in Plaintiff's name (the "Capital One Credit Card") without Plaintiff's knowledge or authorization.

60.    The billing address used for the Capital One Credit Card was Defendant's home address in San Diego, California.

61.    As a result of the Capital One Credit Card being applied for and opened, information concerning Plaintiff was transmitted to consumer reporting agencies, including Equifax, Experian, and TransUnion, that otherwise would not have been transmitted or provided.

62.     Upon information and belief, Defendant used the Capital One Credit Card to make thousands of dollars of purchases for his own benefit, without Plaintiff's knowledge or consent. Specifically, the June 16, 2022, credit card statement reflects that the Capital One Credit Card was used to make approximately $13,734 in purchases between May 30 and June 8, 2022, including, but not limited to: $7,257 for "California Closets"; $4,467.64 for VRBO; and $1,548.81 for what is listed as an "APR Boutique Event."  Other charges included a movie theater in San Diego, California, where Defendant lives, and a payment to the City of Carlsbad, where Defendant has an ownership interest in real estate.  Defendant also used the Capital One Credit Card to make charges in the Southern District of New York when Defendant was in New York City.

63.     Plaintiff did not make or authorize any of these purchases or otherwise derive any benefit from them.

## DEFENDANT'S THEFT OF THE PROCEEDS OF THE COLGATE-PALMOLIVE STOCK SALE

64.     Defendant's scheme to defraud his mother and steal her assets included his unauthorized use of her identity to cause a stock transfer agent to sell Colgate-Palmolive stock that Plaintiff held and send the proceeds to Defendant's address so that he could steal them. Specifically, Defendant, without Plaintiff's authorization or consent, instructed stock transfer agent Computershare to sell Colgate-Palmolive stock held by Plaintiff and directed Computershare to send the check to his home.  He then negotiated the check through the Fraudulent Wells Fargo account—which he had opened in his and Plaintiff's name without Plaintiff's knowledge or consent—and used the approximately $50,375.80 for his own purposes.

65.     Plaintiff has a brokerage account with Computershare.  Until recently, that account held a single position: roughly 644 shares of Colgate-Palmolive stock.

66.     Upon information and belief, Defendant was able to change the email address and mailing address associated with Plaintiff's account to his email address and his mailing address in San Diego, California.

67.     On or about May 24, 2022, Defendant—without Plaintiff's knowledge or authorization—instructed Computershare to update Plaintiff's security access.  In connection with this security access request, a letter with a verification code was sent to Plaintiff's Manhattan apartment.

68.     On or about May 26, 2022—without Plaintiff's knowledge or authorization— Defendant caused Computershare to liquidate the roughly 644 shares of Colgate-Palmolive stock held in Plaintiff's account.

69.     On or about May 31, 2022—without Plaintiff's knowledge or authorization— Defendant caused Computershare to send a check for $50,375.80, representing the proceeds from the sale of the Colgate-Palmolive stock, via UPS, to Defendant's San Diego, California, address. The check was made payable to Plaintiff, but it was sent to Defendant's address without Plaintiff's knowledge or consent.

70.     On or about June 2, 2022, without Plaintiff's knowledge or consent, Defendant opened the Fraudulent Wells Fargo Account referenced above in both his and Plaintiff's name.

71.     On or about June 6, 2022—without Plaintiff's knowledge or authorization— Defendant deposited or caused to be deposited the $50,375.80 check, representing the proceeds from the Colgate-Palmolive stock sale, into the Fraudulent Wells Fargo Account.

72.     Between June 9, 2022, and June 16, 2022, Defendant made purchases totaling approximately $15,441 using funds from the stolen proceeds of the Colgate-Palmolive stock sale that he had deposited into the Fraudulent Wells Fargo Account.  Additionally, between June 15,

2022, and July 18, 2022, Defendant transferred approximately $33,472 to bank accounts at Wells Fargo and Comerica Bank that, upon information and belief, Defendant owns and/or controls.

### DEFENDANT'S UNAUTHORIZED CHANGE OF PLAINTIFF'S MAILING ADDRESS AND THEFT OF HER LONG-TERM CARE INSURANCE PAYMENTS

73.     As a further part of Defendant's scheme to defraud Plaintiff and steal her assets, Defendant submitted a false change-of-address form to the USPS changing his mother's mailing address from her address in New York County, New York, to his address in San Diego, California, without her knowledge or authorization.  He then collected her long-term care insurance checks, which she receives on approximately a weekly basis, deposited two of those checks in the Fraudulent Wells Fargo Account, and transferred the proceeds to other accounts in his name.

74.     Specifically, Plaintiff periodically receives a variety of checks at her apartment in Manhattan.  Beginning in or about July 2022, Plaintiff received her long-term care insurance checks on approximately a weekly basis.

75.     Upon information and belief, because of Defendant's prior role as a financial adviser to Plaintiff and his familiarity with her financial affairs, he would have known generally that she periodically received checks in the mail.  And while Plaintiff did not receive long-term care checks before she terminated Defendant's role as a financial adviser, upon information and belief, Defendant knew that she was entitled to long-term care insurance benefits as a result of her recent health-related issues.

76.     On or about September 26, 2022, without Plaintiff's knowledge or consent, Defendant caused an official USPS change-of-address form to be submitted to the USPS changing Plaintiff's mailing address from her Manhattan apartment to Defendant's apartment in San Diego, California.

77.     Subsequently, checks (and other mail matter) that ordinarily would have been delivered to Plaintiff's Manhattan apartment were delivered to Defendant's apartment in San Diego.  In particular, two checks from Plaintiff's long-term care insurer, Continental, were sent to Defendant's address: (1) Continental Check Number 401955223 dated September 27, 2022, and made payable to "Mausner, Irena K" at her address in New York in the amount of $3,503.20 and (2) Continental Check Number 401957277 dated October 6, 2022, and made payable to "Mausner, Irena K" at her address in New York in the amount of $3,542.00.  As a result of the fraudulent change-of-address form filed by Defendant, these two checks were delivered by USPS to Defendant's address in San Diego, California.

78.     On or about October 17, 2022, Defendant deposited the $3,542 check into the Fraudulent Wells Fargo Account.  The next day, on or about October 18, 2022, Defendant deposited the $3,503.20 check into the Fraudulent Wells Fargo Account.  By the next day, October 19, 2022, Defendant had transferred all of the proceeds of these two checks from the Fraudulent Wells Fargo Account into other bank accounts at Wells Fargo that Defendant owns or controls.

**<u>DEFENDANT'S FORGERY OF PLAINTIFF'S NAME AND SIGNATURE</u>**

79.     In furtherance of Defendant's scheme to defraud, he has regularly forged Plaintiff's signature on a variety of documents, either by using a signature stamp bearing her signature or by forging her signature manually.  Defendant has used forged documents purporting to bear his mother's signature to fraudulently attempt to transfer to himself the title to two parcels of real property in which Plaintiff held or holds an ownership interest—either as an individual or as the trustee of the Trust—with Defendant.  Defendant has also forged documents and submitted them to JPM in an effort to obtain mortgage assistance relief.

80.     Specifically, when Plaintiff was a practicing prosthodontist, she had a signature stamp which she used, and authorized certain others to use, to administer her dental practice.  Upon

information and belief, Defendant now possesses that signature stamp bearing Plaintiff's signature. Defendant is not authorized to possess or use this signature stamp.

81.     Notwithstanding his lack of authorization, upon information and belief, Defendant has used the signature stamp on numerous occasions to benefit himself at Plaintiff's expense.

82.     Upon information and belief, Defendant has also forged Plaintiff's signature by hand.

83.     Defendant has also impersonated Plaintiff over the phone.

84.     The following incidents are illustrative, and they are not an exhaustive list of Defendant's unauthorized uses of Plaintiff's signature stamp, manual forgery of her signature, and/or impersonation of her identity.

<u>Forged Deeds Purportedly Transferring Plaintiff's Interest in Real Estate to Defendant</u>

85.     Until recently, Defendant resided in an apartment in a high-rise building in San Diego, California, the address of which was 888 West E. Street, Unit 1601, San Diego, California (the "San Diego Property").  The apartment was owned, as tenants-in-common, by Plaintiff (and later by the Trust) and Defendant.  Plaintiff financed the purchase of the San Diego Property by taking out a mortgage loan from JPM and providing the down payment on the property.  Until recently, Plaintiff made mortgage payments to JPM.

86.     Plaintiff (and later the Trust) and Defendant also own, as tenants-in-common, a house in Carlsbad, California, with an address of 6226 Rancho Bravado, Carlsbad, California (the "Carlsbad Property").

87.     On or about August 25, 2022, without Plaintiff's knowledge or authorization, Defendant executed, or caused to be executed, a forged Grant Deed, purportedly transferring Plaintiff's ownership interest in the San Diego Property to Defendant for no valuable consideration

(the "Forged San Diego Deed").  He subsequently recorded this fraudulent deed, or caused it to be recorded, with the San Diego County Recorder.

88.     Defendant forged or caused to be forged Plaintiff's signature on the Forged San Diego Deed.  The forged signature is fraudulently notarized with the notary stamp of a woman who had been Defendant's executive and personal assistant at J.S. Oliver.  Upon information and belief, Defendant used the notary stamp of his former employee to fraudulently notarize the Forged San Diego Deed.

89.     After the phony deed had been recorded, on or about September 16, 2022, Defendant, without Plaintiff's authorization or consent, engaged a realtor to list the San Diego Property.  The realtor subsequently marketed the property.

90.     Defendant engaged in the same fraudulent scheme to transfer title to the Carlsbad Property to his name.  Specifically, on or about August 25, 2022, without Plaintiff's knowledge or authorization, Defendant executed, or caused to be executed, a forged Grant Deed, purportedly transferring Plaintiff's ownership interest in the Carlsbad Property to Defendant for no valuable consideration (the "Forged Carlsbad Deed").  He subsequently recorded this fraudulent deed, or caused it to be recorded, with the San Diego County Recorder.

91.     Defendant forged or caused to be forged Plaintiff's signature on the Forged Carlsbad Deed.  The forged signature is fraudulently notarized with the notary stamp of a woman who had been Defendant's executive and personal assistant at J.S. Oliver.  Upon information and belief, Defendant used the notary stamp of his former employee to fraudulently notarize the Forged Carlsbad Deed.

92.     The woman whose notary stamp was used to fraudulently notarize the Forged San Diego Deed and the Forged Carlsbad Deed purports to be a California notary.  The notary block

purporting to correspond to Plaintiff's signature on these phony Grant Deeds reflects that Plaintiff appeared before the notary in San Diego, California, on August 24, 2022, to sign the documents. Plaintiff was not in California on the date that the phony Grant Deeds reflect that she signed them, and California notaries were not permitted to conduct remote online notarizations (i.e., the personal appearance of the document signer is required before the notary).

93.     Upon information and belief, Defendant executed and recorded, or caused to be executed and recorded, the fraudulent Grant Deeds in order to obtain sole ownership of the two properties, sell them, and keep an excess amount, if not all, of the proceeds for himself.

94.     Upon information and belief, the principal reason why Defendant was unable to accomplish his goal was that, on or about September 14, 2022, at a time when Plaintiff was still unaware of the Forged San Diego Deed and the Forged Carlsbad Deed, she filed a separate deed on each property in which she transferred her interest from herself as an individual to herself as the trustee of the Trust.

95.     In or about October 2022, Plaintiff discovered the Forged San Diego Deed and the Forged Carlsbad Deed and took steps necessary to clear the cloud on title created by the fraudulent deeds.  In so doing, she incurred significant attorneys' fees and costs.

96.     Additionally, she was inconvenienced and had to expend both time and effort to remedy the situation and remove the doubt that Defendant cast on her title.

97.     On or about October 18, 2022, after Plaintiff's representatives confronted Defendant with his fraud in connection with the Forged San Diego Deed, Defendant executed a quitclaim deed nullifying the Forged San Diego Deed, and this quitclaim deed was recorded with the San Diego County Recorder on or about October 19, 2022.  In this quitclaim deed, Defendant acknowledged that the Forged San Diego Deed "was filed without the authorization of tenant-in-

common Irena K. Mausner and was not signed by Irena K. Mausner" and, as a result, "is null and void."

98.     After cloud on the title for the San Diego Property was cleared, the property was sold.  The net proceeds are being held in an escrow account.  Based on her contributions to this property, Plaintiff is entitled to the vast majority, if not all, of the proceeds of the sale of the San Diego Property.

99.     On or about October 18, 2022, after Plaintiff's representatives confronted Defendant with his fraud in connection with the Forged Carlsbad Deed, Defendant executed a quitclaim deed nullifying the Forged Carlsbad Deed.   In this quitclaim deed, Defendant acknowledged that the Forged Carlsbad Deed "was filed without the authorization of tenant-in-common Irena K. Mausner and was not signed by Irena K. Mausner" and, as a result, "is null and void."  Notwithstanding this acknowledgment, Defendant refused for several months to permit this quitclaim deed to be filed on the land records.  He finally consented to its filing on February 2, 2023, and the quitclaim deed was filed.

### Forged Documents Submitted to JPM for Mortgage Assistance

100.     As a result of Defendant's conduct with respect to Plaintiff's financial affairs, Plaintiff stopped making mortgage payments on the San Diego Property.

101.     On or about August 29, 2022, without Plaintiff's knowledge or authorization, Defendant faxed JPM a letter, purportedly from Plaintiff, granting Defendant "full access to discuss with [JPM] and make decisions regarding any modifications or restructuring that [JPM] can offer for [the] mortgage."

102.     The letter also requested that JPM send all mortgage-related correspondence to Defendant's San Diego address and use his cell phone number for any mortgage-related calls.

103.    This letter was signed without Plaintiff's knowledge or consent, and upon information and belief, Defendant signed the letter using Plaintiff's signature stamp.

104.    On or about September 13, 2022, Defendant faxed JPM a nearly identical letter. Upon information and belief, Defendant also signed this letter using Plaintiff's signature stamp.

105.    Plaintiff did not authorize Defendant to send these letters to, or otherwise communicate with, JPM regarding the mortgage on the San Diego Property.

106.    Both letters were faxed from an Office Depot located only a short distance from the San Diego Property, where Defendant was residing at the time.

107.    On or about August 3, 2022, Defendant sent a "Request for Mortgage Assistance Form" to JPM in connection with the mortgage on the San Diego Property.

108.    The form purports to be submitted by both Plaintiff and Defendant, and, upon information and belief, Defendant signed it using Plaintiff's signature stamp.

109.    On or about August 10, 2022, and on or about September 16, 2022, Defendant sent nearly identical "Request for Mortgage Assistance Form[s]" to JPM in connection with the mortgage on the San Diego Property.

110.    The forms purport to be submitted by both Plaintiff and Defendant, and, upon information and belief, Defendant signed them using Plaintiff's signature stamp.

111.    Plaintiff did not authorize Defendant to submit these forms or communicate with JPM regarding the mortgage.

                    Defendant Impersonates Plaintiff Over the Phone

112.    On all three "Request for Mortgage Assistance Form[s]" that Defendant fraudulently submitted to JPM, he indicated that Plaintiff desired to be contacted by either text or phone call and listed his cell phone number (not hers).

21

113.    On or about September 19, 2022, a representative from JPM called Defendant's cell phone, attempting to reach Plaintiff, in connection with Defendant's mortgage assistance application.

114.    During this call, Defendant impersonated Plaintiff.  Specifically, at the beginning of this call, the JPM representative asked to confirm that she was speaking to "Irena Mausner," and Defendant said that she was.  Additionally, during the call, Defendant referred to "Ian Mausner" in the third person.

<u>Defendant's Identity Theft Is Ongoing</u>

115.    Defendant's fraudulent conduct appears to be ongoing, and Plaintiff's other assets remain at risk.

116.    For instance, upon information and belief, in November 2022, someone who was believed to be disguising his or her voice contacted a broker-dealer that holds a retirement account for Plaintiff's benefit and sought information about the account.  Based on his prior actions vis-à-vis Plaintiff's assets and his familiarity with her financial affairs, Plaintiff believes that Defendant was the person who contacted the broker-dealer to access Plaintiff's account, with the goal of transferring funds to himself.

117.    Additionally, in connection with Plaintiff's review of her assets, Defendant attempted to hide his fraudulent activity by pointing to a purported agreement between Plaintiff and Defendant concerning various financial commitments.  This purported agreement is fraudulent, and Plaintiff did not sign it.  Upon information and belief, Defendant used Plaintiff's signature stamp to sign it.

118.    On or about January 17, 2023, Plaintiff received two emails from Wells Fargo about an account with which Plaintiff is not familiar.  The first communication indicated that Plaintiff's

22

address information had been changed to her residence address in New York County. Plaintiff received the second email a short time later on the same day, and it noted that her address had been changed to an address at "501 W Broadway." Defendant has used 501 W Broadway, Ste. A413, San Diego, California, 92101 as his address in other documents. Upon information and belief, this address is for a post office box at a UPS Store. Plaintiff continues to investigate this Wells Fargo account, but she did not authorize Defendant to open such an account for her or in her name, nor did she know about or authorize Defendant to change the address of any financial accounts at any financial institution, including Wells Fargo, to his address.

119.    Upon information and belief, Defendant engaged in other acts of fraud and identity theft in December 2022 and January 2023. For instance, in January 2023, Plaintiff received correspondence from City National Bank ("CNB"), which holds the mortgage on the Carlsbad Property. The correspondence indicates that, in connection with the Carlsbad Property mortgage, Defendant submitted a loss-mitigation application to CNB as well as an appeal of CNB's denial of that application. Plaintiff never submitted or authorized Defendant to submit such an application or appeal in her name, nor was she aware that he had done so until recently when she belatedly received CNB's notice. That notice from CNB was originally addressed to Plaintiff and Defendant at Defendant's address in California (and the address of the Carlsbad Property), and the correspondence was subsequently forwarded to Plaintiff's apartment in Manhattan. Plaintiff was not aware that the address on file for her at CNB had been changed to Defendant's address, nor did she authorize such a change.

120.    Most recently, on or about January 26, 2023, Defendant fraudulently signed Plaintiff's name—by routing the documents to a fraudulently opened email address purporting to be Plaintiff's and using Docusign—on several documents, including a residential listing

agreement, in connection with listing the Carlsbad Property for sale.  Plaintiff did not authorize Defendant to list the Carlsbad Property for sale at that time, nor did she know about or authorize Defendant to execute any of these documents on her behalf.

## PLAINTIFF REQUIRES ADDITIONAL INFORMATION CONCERNING HER OTHER ASSETS THAT DEFENDANT HAS HAD ACCESS TO IN ORDER TO PURSUE THEM AND ENSURE THEY ARE SAFEGUARDED

121.    In addition to Robinhood, Plaintiff has or had accounts at several other brokerages and investment firms, including, but not limited to, Coinbase, E*Trade, Ameritrade, and Arca Digital Assets.  In his former role as Plaintiff's adviser, Defendant facilitated transfers of Plaintiff's money into those accounts and made trades on Plaintiff's behalf in those accounts.

122.    For instance, between December 2017 and May 2022, more than $550,000 was deposited from Plaintiff's bank accounts into a Coinbase account in Plaintiff's name.  During that same period, significant sums of money were transferred from the Coinbase account into several bank accounts, including not only Plaintiff's accounts, but also accounts that belong to Defendant, and accounts the ownership of which is currently unknown.

123.    As noted above, Defendant has refused to provide Plaintiff with a complete accounting of her assets.  For that reason, she does not know, with any precision or certainty, how the money that was put into these accounts was used and where it is now.

## COUNT I: EQUITABLE ACCOUNTING[1]

124.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

125.    While serving as Plaintiff's adviser, and by virtue of being her son, whom she entrusted in helping her manage her financial affairs, Defendant owed Plaintiff fiduciary duties.

---

[1] Unless otherwise noted, all claims are brought by Plaintiff in her individual capacity.

126.     Plaintiff entrusted her money to Defendant by, at times, granting him the ability to execute trades on her behalf and permitting him to interact with financial institutions' representatives on her behalf for the purpose of investing her money for her benefit.

127.     Plaintiff has repeatedly demanded a comprehensive accounting of her assets, including, but not limited to, the funds that were transferred to and held at Robinhood, Coinbase, E*Trade, Ameritrade, and Arca Digital Assets, and Defendant has failed to provide one.

128.     As a former fiduciary, Defendant is required to produce all relevant financial records, demonstrate how Plaintiff's money was expended, and return any pilfered funds in his possession.

129.     Based on the information gleaned from an accounting, Plaintiff may assert additional claims against Defendant and/or amend the claims set forth herein.

## COUNT II: BREACH OF FIDUCIARY DUTY (FINANCIAL ADVISER AND SON)

130.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

131.     While serving as Plaintiff's adviser, and by virtue of being her son, whom she entrusted in helping her manage her financial affairs, Defendant owed her fiduciary duties.  At all such times, Plaintiff believed that Defendant was acting as a faithful adviser and son and was acting in her best interests.

132.     By facilitating the transfer of more than $1.7 million from Plaintiff's bank accounts into Robinhood Account A, which was not in Plaintiff's name, and by supplying Plaintiff with a phony account statement purporting to show Plaintiff's ownership and control of the account, when, in fact, Defendant himself owned and controlled the account, Defendant breached his duties of loyalty and good faith and engaged in impermissible self-dealing.

133.     Plaintiff suffered damage as a direct result of this breach—namely, she lost at least $1.7 million.

134.     By facilitating the transfer of $100,000 from Plaintiff's genuine IRA at JPM to an account at Wells Fargo belonging to Defendant, Defendant breached his duties of loyalty and good faith and engaged in impermissible self-dealing.

135.     Plaintiff suffered damage as a direct result of this breach, in an amount to be proven at trial.

136.     Because Defendant's misconduct, as described above, exhibits a very high degree of moral culpability, Plaintiff is entitled to punitive damages on her breach of fiduciary duty claim.

## COUNT III: BREACH OF FIDUCIARY DUTY (TENANT-IN-COMMON) (ASSERTED BY PLAINTIFF IN HER INDIVIDUAL CAPACITY AND AS TRUSTEE OF THE TRUST)

137.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

138.     With respect to the San Diego Property and the Carlsbad Property, Defendant owed Plaintiff fiduciary duties in his capacity as a tenant-in-common with Plaintiff, either individually or via her role as trustee of the Trust.

139.     By executing and recording, or causing to be recorded, the Forged San Diego Deed and the Forged Carlsbad Deed, purportedly extinguishing Plaintiff's interest in these properties in favor of Defendant, Defendant breached his duties.

140.     Plaintiff suffered and continues to suffer damages as a direct result of this breach—namely, she was required to expend time, energy, and resources (including incurring substantial attorneys' fees) to attempt to clear the cloud on title that Defendant caused and restore the ownership to the pre-fraud status quo.

141.    Because Defendant's misconduct, as described above, exhibits a very high degree of moral culpability, Plaintiff is entitled to punitive damages on her breach of fiduciary duty claim.

## COUNT IV: CONVERSION (ROBINHOOD)

142.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

143.    Plaintiff had legal ownership of, and the immediate right of possession to, all of her money, property, and other assets, including, but not limited to, the money in her bank accounts.

144.    Between May 2018 and February 2022, Defendant engaged in a course of conduct whereby he caused more than $1.7 million of Plaintiff's money to be transferred from her bank accounts to Robinhood Account A in dozens of discrete, identifiable transfers.

145.    Upon information and belief, at all times relevant, Defendant has exercised exclusive control over Robinhood Account A.

146.    Plaintiff does not have access to Robinhood Account A.

147.    Defendant's exercise of control interferes with Plaintiff's right of possession over her money.

148.    Defendant's exercise of control over this money is unauthorized.

149.    Plaintiff was damaged by Defendant's conversion—namely, she lost at least $1.7 million.

150.    Because, as described above, Defendant converted Plaintiff's property with malice and reckless and willful disregard for her rights, Plaintiff is entitled to punitive damages on her conversion claim.

## COUNT V: CONVERSION (IRA)

151.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

152.    Plaintiff had legal ownership of, and the immediate right of possession to, the money in her IRA at JPM.

153.    On or about January 5, 2022, Defendant—without Plaintiff's knowledge or authorization—facilitated the transfer of $100,000 from Plaintiff's IRA at JPM to an account at Wells Fargo which, while named "Irena K. Mausner IRA," is not owned by Plaintiff nor maintained for her benefit.

154.    Upon information and belief, the account at Wells Fargo into which the $100,000 was transferred is owned and controlled by Defendant and he named it "Irena K. Mausner IRA" in an attempt to avoid detection.

155.    Defendant's exercise of control interferes with Plaintiff's right of possession over this money.

156.    Defendant's exercise of control over this money is unauthorized.

157.    Plaintiff was damaged by Defendant's conversion—namely, she lost at least $100,000.

158.    Because, as described above, Defendant converted Plaintiff's property with malice and reckless and willful disregard for her rights, Plaintiff is entitled to punitive damages on her conversion claim.

### COUNT VI: CONVERSION (COLGATE-PALMOLIVE STOCK)

159.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

160.    Plaintiff had legal ownership of, and the immediate right of possession to, the approximately 644 shares of Colgate-Palmolive formerly in her Computershare account.

161.    Defendant—without    Plaintiff's    knowledge    or    authorization—caused Computershare to sell the shares and send a check representing the proceeds to his San Diego address.

162.    The check, which was made out to Plaintiff, was negotiated even though Plaintiff did not negotiate it or authorize anyone to negotiate it on her behalf.

163.    Defendant deposited the check into the Fraudulent Wells Fargo Account and exercised control over the money by using it to make personal purchases and/or transferring it into bank accounts that he owns or controls.

164.    Defendant's exercise of control interferes with Plaintiff's right of possession over this money.

165.    Defendant's exercise of control over this money is unauthorized.

166.    Plaintiff was damaged by Defendant's conversion—she lost at least $50,375.80.

167.    Because, as described above, Defendant converted Plaintiff's property with malice and reckless and willful disregard for her rights, Plaintiff is entitled to punitive damages on her conversion claim.

### COUNT VII: CONVERSION (LONG-TERM CARE INSURANCE CHECKS)

168.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

169.    Plaintiff had legal ownership of, and the immediate right of possession to, her long-term care insurance checks in the amounts of $3,542 and $3,503.20.

170.    Upon information and belief, Defendant—without Plaintiff's knowledge or authorization—caused USPS to change Plaintiff's mailing address from her Manhattan apartment to the San Diego Property.

171.    As a result of this change of address, the Continental checks for $3,542 and $3,503.20 were sent to the San Diego Property, instead of Plaintiff's Manhattan address.

172.    Defendant deposited these checks into the Fraudulent Wells Fargo Account and exercised control over the money by transferring it into bank accounts that he owns or controls.

173.    Defendant's exercise of control interferes with Plaintiff's right of possession over this money.

174.    Defendant's exercise of control over this money is unauthorized.

175.    Plaintiff was damaged by Defendant's conversion—namely, she lost at least $7,045.

176.    Because, as described above, Defendant converted Plaintiff's property with malice and reckless and willful disregard for her rights, Plaintiff is entitled to punitive damages on her conversion claim.

## COUNT VIII: SLANDER OF TITLE (SAN DIEGO PROPERTY) (ASSERTED BY PLAINTIFF IN HER INDIVIDUAL CAPACITY AND AS TRUSTEE OF THE TRUST)

177.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

178.    On or about August 25, 2022, without Plaintiff's knowledge or authorization, Defendant executed or caused to be executed the Forged San Diego Deed, purportedly transferring Plaintiff's ownership interest in the San Diego Property to Defendant for no valuable consideration.

179.    Defendant subsequently published this fraudulent deed, or caused it to be published, by recording it, or causing it to be recorded, with the San Diego County Recorder.

180.    The Forged San Diego Deed cast doubt on the ownership of, and called into question Plaintiff's interest in, the San Diego property.

181.     In taking these actions, Defendant acted without privilege or justification.  Rather, he acted with fraudulent intent and in conscious disregard of Plaintiff's rights.

182.     Upon information and belief, by executing and recording or causing the execution and recording of the Forged San Diego Deed, Defendant was attempting to gain full title over the San Diego Property, sell it, and keep some or all of the proceeds for himself, notwithstanding the fact that Plaintiff paid for the property, had been responsible for all related expenses since its purchase, and, via her role as trustee of the Trust, had an ownership interest in the property entitling her to a substantial portion, if not the entirety, of any sales proceeds.

183.     The Forged San Diego Deed was false.  Plaintiff did not execute or record the Forged San Diego Deed, nor did she authorize its execution or recordation or intend to transfer her interest in the San Diego Property to Defendant.

184.     Defendant's actions caused Plaintiff direct and immediate pecuniary loss.  Among other things, she incurred legal expenses taking necessary steps to remove the doubt cast by Defendant's slander and suffered general damages in the form of time and inconvenience in removing the doubt cast by Defendant's slander.

185.     Plaintiff is entitled to punitive damages because, as described above, Defendant engaged in fraud and acted with malice.

## COUNT IX: SLANDER OF TITLE (CARLSBAD PROPERTY) (ASSERTED BY PLAINTIFF IN HER INDIVIDUAL CAPACITY AND AS TRUSTEE OF THE TRUST)

186.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

187.     On or about August 25, 2022, without Plaintiff's knowledge or authorization, Defendant executed or caused the execution of the Forged Carlsbad Deed, purportedly transferring Plaintiff's ownership interest in the Carlsbad Property to Defendant for no valuable consideration.

188.    Defendant subsequently published this fraudulent deed, or caused it to be published, by recording it, or causing it to be recorded, with the San Diego County Recorder.

189.    The Forged Carlsbad Deed cast doubt on the ownership of, and called into question Plaintiff's interest in, the Carlsbad Property.

190.    In taking these actions, Defendant acted without privilege or justification.  Rather, he acted with fraudulent intent and in conscious disregard of Plaintiff's rights.

191.    Upon information and belief, by executing and recording or causing the execution and recording of the Forged Carlsbad Deed, Defendant was attempting to gain full title over the Carlsbad Property, sell it, and keep the proceeds for himself notwithstanding the fact that Plaintiff, via her role as trustee of the Trust, has an ownership interest in the property entitling her to a portion of any sales proceeds.

192.    The Forged Carlsbad Deed was false.  Plaintiff did not execute or record the Forged Carlsbad Deed, nor did she authorize its execution or recordation or intend to transfer her interest in the Carlsbad Property to Defendant.

193.    Defendant's actions caused Plaintiff direct and immediate pecuniary loss.  Among other things, before February 2, 2023, when he finally authorized the October 18, 2022 quitclaim to be recorded with the San Diego County Recorder, Defendant had refused to permit the quitclaim deed to be filed on the land records.  As a result, Plaintiff has incurred legal expenses taking necessary steps to remove the doubt cast by Defendant's slander and suffered general damages in the form of time and inconvenience in removing the doubt cast by Defendant's slander.

194.    Plaintiff is entitled to punitive damages because, as described above, Defendant engaged in fraud and acted with malice.

## **COUNT X: FRAUD**

195. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

196. As set forth above, Defendant has made numerous material misstatements and omissions in an effort to obtain money and property belonging to Plaintiff. Plaintiff and others acting on her behalf relied on those material misstatements and omissions to her detriment, and Plaintiff suffered harm as a result.

197. Among other material misrepresentations and omissions, Defendant made multiple material misrepresentations to Plaintiff about the Robinhood accounts and omitted to tell Plaintiff material facts about the Robinhood accounts including, but not limited to, the fact that Robinhood Account A into which he transferred over $1.7 million of Plaintiff's money was in Defendant's name and under his control, not, as he led Plaintiff to believe, in her name or under her control.

198. Among his false representations and omissions to Plaintiff, Defendant sent Plaintiff an email on or about February 16, 2020, attaching the Phony Account Statement noting that Robinhood Account A was in Plaintiff's name and had a balance exceeding $166,000. This representation was false, as the account was never in Plaintiff's name and was always in Defendant's name and therefore subject to his control.

199. Defendant also falsely told Plaintiff, via text message, on or about November 26, 2021, that Plaintiff had "approx. $1mm in Robinhood."

200. Throughout the course of his serving as Plaintiff's financial adviser, Defendant failed to disclose to Plaintiff the material fact that Robinhood Account A, into which he caused over $1.7 million of Plaintiff's funds to be transferred, was in his name, not Plaintiff's, and was therefore subject to his dominion and control and not Plaintiff's.

201.    Defendant knew that his material representations and omissions were false when he made them because he had access to and/or control over both Robinhood Account A, which was not in Plaintiff's name, and Robinhood Account B, which was in her name and had been dormant since December 2019.

202.    Defendant made these statements to induce Plaintiff's reliance on them. Specifically, he made the statements so that he could transfer additional money from Plaintiff's accounts into Robinhood Account A and then use the money for his personal benefit.

203.    Plaintiff was justified in relying on Defendant's statements because Defendant was her son and adviser, who owed her fiduciary duties.  She therefore justifiably believed that he was acting in her best interest.

204.    Plaintiff suffered damages as a result of Defendant's material misrepresentations. Among other things, if she had not been told that Robinhood Account A was in her name or that it was performing well (i.e., had a balance of approximately $166,000 as of December 2019 and a balance of approximately $1 million in November 2021), she would not have allowed more money to be sent to Robinhood and Defendant would not have been able to transfer additional funds to Robinhood Account A.

205.    As set forth in greater detail above, Defendant made several other material misstatements and omissions, including, but not limited to, misstatements and omissions in communications with Computershare, the USPS, Capital One, JPM, and the San Diego County Recorder.  These misrepresentations were designed to obtain and did result in Defendant's obtaining Plaintiff's assets and other personal benefits.

206.    Because, as described above, Defendant's fraud was gross, wanton, and willful and he was morally culpable, Plaintiff is entitled to punitive damages.

## COUNT XI: NEW YORK FAIR CREDIT REPORTING ACT
### (N.Y. GEN. BUS. §§ 380-S, 380-L)

207.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

208.    Defendant, knowingly and with the intent to defraud, opened the Capital One Credit Card in Plaintiff's name without her consent or authorization.

209.    Defendant used that card to make purchases for his benefit without Plaintiff's consent or authorization.   Specifically, he used the Capital One Credit Card for $13,734 in purchases, including, but not limited to, $7,257 for "California Closets," $4,467.64 for VRBO, and $1,548.81 for what is listed as an "APR Boutique Event."

210.    As a result of Defendant's actions, information that otherwise would not have been transmitted or provided to Equifax, Experian, and TransUnion, which are consumer reporting agencies, was transmitted or provided to Equifax, Experian, and TransUnion.

211.    Plaintiff suffered actual damages, including embarrassment, emotional distress, and the time and expense of her representatives taking steps to rectify the problem.

212.    Plaintiff is entitled to actual damages, punitive damages, costs, and attorneys' fees.

## COUNT XII: UNJUST ENRICHMENT

213.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

214.    Upon information and belief, Defendant has, among other things:

    a.    kept (and/or used for his personal benefit) the more than $1.7 million that was transferred from Plaintiff's bank accounts into Robinhood Account A;

    b.    kept (and/or used for his personal benefit) the $100,000 that was transferred from Plaintiff's IRA at JPM into the Wells Fargo bank account that Defendant owns and controls;

      c.     used the fraudulently obtained Capital One Credit Card to buy personal items;

      d.     kept (and/or used for his personal benefit) the $50,375.80 in proceeds from the sale of Plaintiff's Colgate-Palmolive stock; and

      e.     kept (and/or used for his personal benefit) the $3,542 check and the $3,503.20 check from Plaintiff's long-term care insurer.

215.    Upon information and belief, Defendant has obtained other funds from Plaintiff which he has failed to account for and which he has kept and used for his personal benefit

216.    This enrichment to Defendant came directly at Plaintiff's expense.

217.    Given the circumstances, it would be against equity and good conscience to permit Defendant to retain this money and property.  Specifically, Defendant has engaged in a consistent pattern of fraud and deceit, designed to benefit himself at his mother's expense.  Allowing Defendant to reap the benefits of his misconduct would be against equity and good conscience.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests relief and judgment against Defendant as follows:

      a.     For a judgment against Defendant for the causes of action alleged against him;

      b.     For compensatory damages in an amount to be proven at trial and, in any event, not less than $1.8 million;

      c.     For punitive damages;

      d.     For appropriate injunctive relief, including, among other things, an order (1) requiring Defendant to provide Plaintiff with an accounting, (2) requiring the proceeds from the sale of the San Diego Property currently in escrow to be submitted to the Court's possession for the satisfaction of a

future judgment, and (3) enjoining Defendant from acting on Plaintiff's behalf or in her name; communicating with any business, government entity, or financial institution concerning Plaintiff; signing Plaintiff's name on any documents or affixing Plaintiff's signature to any documents; impersonating Plaintiff in any way or otherwise making use of Plaintiff's identity; or engaging in any action that would bind Plaintiff, transfer, encumber, or devalue any of her assets, create liabilities for Plaintiff, or otherwise affect Plaintiff's financial affairs;

e.  For pre-judgment and post-judgment interest at the maximum rate permitted by law;

f.  For Plaintiff's attorneys' fees;

g.  For Plaintiff's costs; and

h.  For such other relief in law or equity as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  February 6, 2023                    Respectfully submitted,

By: */s/ Seth L. Levine*
Seth L. Levine
Paul A. Murphy
Steven W. Kessler

**LEVINE LEE LLP**

1500 Broadway, Suite 2501
New York, New York 10036
Telephone: (212) 223-4400
slevine@levinelee.com
pmurphy@levinelee.com
skessler@levinelee.com

*Attorneys for Plaintiff Irena K. Mausner, individually and as trustee of the Irena K. Mausner Revocable Trust U/A/D May 16, 2022*

38