UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                         :

IRENA K. MAUSNER, *individually and as trustee of the*   :
*Irena K. Mausner Revocable Trust U/A/D May 16, 2022,*   :
                                         :

                   Plaintiff,         :            23-CV-994 (JMF)
                                         :

          -v-                         :          OPINION AND ORDER
                                         :

IAN O. MAUSNER,                        :
                                         :

                 Defendant.       :
                                         :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      This lawsuit is between Irena K. Mausner ("Plaintiff") — who is nearly ninety years old — and her adult son, Ian O. Mausner ("Defendant"). At bottom, Plaintiff alleges that Defendant, who acted as her financial "advisor" for many years, stole or tried to steal assets worth millions of dollars from her through a scheme involving fraudulent accounts, fake deeds, and forged signatures. On the basis of those allegations, she brings a variety of claims under New York and California law. Now pending are three motions: cross-motions by each party for summary judgment and Defendant's letter motion seeking discovery (and a related extension of the discovery deadline) and sanctions. Significantly, Defendant was represented by counsel when Plaintiff filed, and he opposed, her summary judgment motion. By contrast, Defendant filed his cross-motion for summary judgment and letter motion without counsel.

      It is a shame that this case ever came to be. It is also a shame that it has reached this point, as the parties — with the Court's assistance and encouragement — came close to reaching a settlement. But the Court has no choice now but to wade into this ugly family dispute. For the reasons that follow, the Court concludes that Plaintiff is entitled to summary judgment (at least

as to liability, if not as to damages) on the vast majority of her claims because the evidence is overwhelming that Defendant blatantly stole or tried to steal many of her assets. It follows that Defendant's cross-motion for summary judgment is largely (although not entirely) denied. Additionally, Defendant's letter motion for discovery and sanctions is denied as meritless.

## BACKGROUND

The Court begins with a recitation of the relevant facts, which are drawn from the admissible materials submitted by the parties in connection with Plaintiff's motion — most notably, the undisputed facts set forth in Plaintiff's Statement of Material Facts, ECF No. 80 ("SOMF"); *see* ECF No. 83 ("Def.'s Resp. to SOMF"), and evidence attached to declarations submitted by Plaintiff's counsel, Seth Levine, ECF No. 81, and by Defendant, ECF No. 84. Unless otherwise noted, the following facts are either undisputed or described in the light most favorable to Defendant. *See, e.g.*, *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

Significantly, the Court deems undisputed those facts as to which Defendant's only response is that he "did not recall" or "does not recall" seeing the relevant corroborating evidence. *See, e.g.*, Def.'s Resp. to SOMF ¶¶ 47, 50, 54, 57, 60, 65, 66, 76, 80, 81, 88, 123; *see also, e.g.*, ECF No. 81-1 ("Mausner Dep."), at 60, 68-71, 73, 75, 78, 80, 84, 88 (professing a lack of memory with respect to certain events or facts). That is because "vague denials and memory lapses . . . do not create genuine issues of material fact." *F.D.I.C. v. Nat'l Union Fire Ins. Co.*, 205 F.3d 66, 75 (2d Cir. 2000). Nor do such responses cast doubt on the authenticity (or admissibility) of evidence otherwise properly authenticated. *See, e.g.*, *Genger v. Genger*, 663 F. App'x 44, 49 n.4 (2d Cir. 2016) (summary order) (holding that the appellant's statement that she "had no recollection of signing . . . the document" did "not constitute a denial" (cleaned up)); *LeClair v. Berkshire Union Free Sch. Dist.*, No. 08-CV-1354 (LEK), 2010 WL 4366897, at *7

(N.D.N.Y. Oct. 28, 2010) ("A statement that Plaintiff does not recall seeing the posting, without anything more, does not undermine Defendant's evidence and thus does not create a genuine dispute regarding a material fact.").

Defendant argues that the Court "must take care to limit its consideration" of some of the evidence attached to Levine's declaration, citing authority for the proposition that "an attorney's affirmation that is not based on personal knowledge of the relevant facts is to be accorded no weight on a motion for summary judgment."  ECF No. 82 ("Def.'s Opp'n"), at 5 (quoting *Little v. City of New York*, 487 F. Supp. 2d 426, 433 n.2 (S.D.N.Y. 2007)).  A declaration from Plaintiff herself or someone with direct personal knowledge would certainly have been preferable (and, as discussed below, the absence of an affidavit from Plaintiff mandates denial of her motion in at least one respect), but Defendant overstates the case with respect to the documents submitted by Levine.  For one thing, it is "well established that an attorney's affidavit *can* be used, in connection with a summary judgment motion, to place documents produced in discovery before the Court."  *Pace v. Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254, 272 (S.D.N.Y. 2016) (emphasis added) (quoting *Harrison-Hoge Indus., Inc. v. Panther Martin S.R.L.*, No. 05-CV-2851 (JFB), 2008 WL 905892, at *27 (E.D.N.Y. Mar. 31, 2008)).  Unlike attorney affirmations that courts in this District have deemed "patently improper," Levine's declaration does not "include[] arguments and factual assertions."  *Risco v. McHugh*, 868 F. Supp. 2d 75, 86 n.2 (S.D.N.Y. 2012).

Additionally, as Plaintiff notes, Defendant never responded to Plaintiff's requests for admission, which encompassed, among other things, the truth and accuracy of all of the relevant documents attached to Levine's declaration.  *See* ECF No. 134 ("Pl.'s Opp'n"), at 3 n.2; ECF No. 134-1, ¶ 6; ECF No. 134-3 ("Requests for Admission"), ¶¶ 55, 81, 84, 88, 97.  Under Rule

36 of the Federal Rules of Civil Procedure, that means that the requests are "deemed admitted" and "conclusively established." *Kia Song Tang v. Glocap Search LLC*, No. 14-CV-1108 (JMF), 2015 WL 1344788, at *1 n.1 (S.D.N.Y. Mar. 24, 2015) (quoting Fed. R. Civ. P. 36(a)(3), (b)). The Court does "have discretion to excuse" Defendant "from [his] admissions," but "that discretion is not appropriate given the circumstances." *Priority Recs. LLC v. Biggers*, No. 06-CV-3076 (BSJ), 2008 WL 11513363, at *2 (S.D.N.Y. Jan. 25, 2008). For starters, Defendant has done his part to "frustrate[] the discovery process" and is therefore not entitled to the full solicitude a Court may grant *pro se* litigants. *Id.*; *see, e.g.*, ECF No. 99, at 2. Additionally, Plaintiff's requests for admission provided clear notice that "[a]ny ground not stated within the time allowed for responding to these requests shall be waived," Requests for Admission 3, assuaging any concern about "the inequity of enforcing default admissions," *Ortiz Martinez v. Salai*, No. 16-CV-1499 (VLB), 2018 WL 1413364, at *4 (D. Conn. Mar. 20, 2018). Thus, the Court will consider as evidence all documents attached to Levine's declaration.

## A. The Parties' Relationship

Plaintiff, a Holocaust survivor and former prosthodontist who was eighty-seven years old when she filed this lawsuit in 2023, resides in New York City. SOMF ¶¶ 1, 2. Defendant is her adult son and resides in San Diego, California. *Id.* ¶ 3. Defendant was a registered investment adviser until he was charged by the U.S. Securities and Exchange Commission ("SEC") with engaging in a "cherry-picking" scheme and misusing soft-dollar credits. *Id.* ¶¶ 5-7. He was later barred from serving as an investment adviser in a settlement with the SEC. *Id.* ¶ 8. Despite that, Defendant has long served as a financial "adviser" to Plaintiff, who — with her late husband — acquired a substantial portfolio of assets. *Id.* ¶¶ 4, 9. Plaintiff's assets include (or included) accounts at several brokerages and investment firms, including, but not limited to, Robinhood,

Coinbase, E*Trade, Ameritrade, and Arca Digital Assets.  *Id.* ¶ 11.  As Plaintiff's "adviser," Defendant was entrusted with Plaintiff's money and regularly interacted with these banks and brokerage institutions on her behalf, including to transfer money between accounts and to order or execute stock trades.  *Id.* ¶¶ 9-12.  Plaintiff and Defendant routinely communicated about investment strategies.  *Id.* ¶ 13; *see* Def.'s Resp. to SOMF ¶ 13; ECF Nos. 84-1 *et seq*.

## B.  Defendant's Alleged Misconduct

Plaintiff accuses Defendant of using his position of trust and familiarity with her assets to steal many of her assets over a period of years.  On May 2, 2022, after discovering some of the alleged misconduct, Plaintiff, through her counsel, informed Defendant that he had no authority to act on her behalf.  SOMF ¶ 36.  But his misconduct allegedly continued.  The following is a summary of the relevant events in chronological order.

### 1.  Transfers of Money from Plaintiff's Robinhood and J.P. Morgan Accounts

Between May 2018 and February 22, 2022, Defendant caused dozens of transfers totaling more than $1.7 million from Plaintiff's bank accounts to an account solely under his name ("Robinhood Account A") at Robinhood Markets, Inc., an electronic stock trading platform.  *Id.* ¶¶ 14, 15; *see* ECF No. 81-2 (Robinhood statement).  According to Defendant, he did so because Plaintiff "wanted certain accounts to be in [Defendant's] name to shield assets from [Defendant's] sister, Nicole Mausner Allinson," whom Plaintiff regarded as "difficult."  Def.'s Resp. to SOMF ¶ 15.  Notably, during his deposition, Defendant testified that, if asked, he would return the money to Plaintiff.  *See, e.g.*, Mausner Dep. 301 ("[I]f she wanted to transfer it back, . . . she could always ask for it back."); *id.* at 325 ("Q. . . . Well, if she asks you for it back, will you give it to her back?  A. If I had the ability — which, as you know, I don't, I would absolutely

give it back to her."); *id.* at 330 ("Q. So you agreed that if your mother requested it, you'd return the funds. That's what you just said, right? A. I did.").

On February 16, 2020, Defendant sent Plaintiff an e-mail attaching "a document purporting to be a Robinhood account statement for Robinhood Account A" (the "Unofficial Robinhood Statement"). SOMF ¶ 16; *see* Requests for Admission ¶ 7. The document indicated that Robinhood Account A was an "Irena Mausner Account" even though the account was solely in Defendant's name. SOMF ¶ 17. According to Defendant, providing an artificial account statement rather than the actual account statement was "consistent with the parties' investment practices, whereby [Defendant] frequently provided her with summary updates on stock sales and realized gains." Def.'s Resp. to SOMF ¶ 16. But the name of the account was not the only inaccuracy in the Unofficial Robinhood Statement. It reported deposits of $40,000 and $73,732 in December 2019 even though "[n]o such deposits were made in Robinhood Account A." SOMF ¶¶ 18, 19. It also indicated that Robinhood Account A's portfolio balance as of December 31, 2019, was $166,007, even though the account's actual portfolio balance was only $141,609.72. *Id.* ¶¶ 20, 21. And it misreported the value of the total securities held in Robinhood Account A as of December 31, 2019, as $196,599, even though the actual value was only $140,176.13. *Id.* ¶¶ 22, 23. According to Defendant, these "disparit[ies] may have resulted from disparities in when Robinhood recognized transactions as having cleared." Def.'s Resp. to SOMF ¶¶ 18-23.

On April 19, 2021, in anticipation of a meeting between Plaintiff and her bankers, Defendant instructed Plaintiff, via text message, to "[j]ust say yes to everything they ask" and to "[j]ust say you are aware of course of the transfers to Robinhood." SOMF ¶ 24. On November 26, 2021, Defendant once again misreported Robinhood Account A's holding, texting Plaintiff

that there was approximately $1 million in Robinhood when the account's actual portfolio value as of November 31, 2021, was only $746,914.74.  *Id.* ¶¶ 25-26.  According to Defendant, the difference between these two figures was due to the fact that "[i]t was not unusual for Robinhood Account A's value to swing with volatility."  Def.'s Resp. to SOMF ¶ 26.

Plaintiff also maintained an Individual Retirement Account at J.P. Morgan (the "J.P. Morgan IRA").  SOMF ¶ 28.  Defendant had helped Plaintiff establish the account and knew the account's password.  *Id.* ¶¶ 30-31; *see* Requests for Admission ¶¶ 29-30.  On or about January 5, 2022, $100,000 was transferred out of Plaintiff's J.P. Morgan IRA into an account at Wells Fargo.  SOMF ¶¶ 32-33.  The delivery instructions for the $100,000 transfer listed the "Beneficiary Name" as "Irena K Mausner IRA"; it referenced the same name after the beneficiary bank account number.  *Id.* ¶ 34; *see* Requests for Admission ¶ 28; ECF No. 81-11. The account number, however, was for Defendant's own bank account at Wells Fargo.  SOMF ¶¶ 33-34; *see* Requests for Admission ¶¶ 8, 11-12.  And that is the account in which the money was deposited.  SOMF ¶ 34.

### 2. Plaintiff's May 2, 2022 Letter to Defendant

Plaintiff suffered a stroke on February 22, 2022.  *See* ECF No. 79 ("Pl.'s Mem."), at 4. While recovering, she discovered Defendant's unauthorized transfers of money from her bank accounts.  *See id.* at 4.  On May 2, 2022, Plaintiff, through her counsel, e-mailed Defendant a letter (the "May 2, 2022 Letter") advising Defendant that he had no authority to act on her behalf.  *Id.* ¶¶ 36, 37; *see* Requests for Admission ¶ 4.  Most relevant here, the May 2, 2022 Letter stated as follows:

> [P]lease be advised that you have no authority or authorization to act in the name of or on behalf of Irena Mausner.  This restriction prohibits you from, among other actions, engaging in any transactions, transfers, or other financial activity in the name of or on behalf of Irena Mausner in any form or manner.  To this end, you are directed to cease

and desist from any further activity, including, but not limited to, any attempts to mortgage property, transfer funds, make payments, or incur debts or other obligations of any kind of Irena Mausner's behalf.

SOMF ¶ 36.  Plaintiff's counsel reiterated these admonitions to Defendant multiple times, including by e-mails dated August 26, 2022, and October 4, 2022.  *Id.* ¶ 38; *see also* ECF Nos. 81-16, 81-17.  Defendant "acknowledges that [Plaintiff's] litigation counsel sent" the May 2, 2022 Letter but believes that Plaintiff "was — and continues to be — unduly influenced by Nicole."  Def.'s Resp. to SOMF ¶¶ 36, 39; *see* ECF No. 103 ("Def.'s Mem."), at 2 (acknowledging that in May 2022 "Plaintiff's attorneys sent an e-mail stating that [Defendant] was to no longer act on [Plaintiff's] behalf").

The May 2, 2022 Letter also requested that Defendant provide a comprehensive accounting of the current status and whereabouts of Plaintiff's assets, stating in relevant part:

> [W]e would ask that you promptly produce to us all materials, communications, and information relating to Irena Mausner in your possession, custody, or control, including, but not limited to, those relating to or concerning any and all accounts (including all passwords and account information to access electronic accounts), assets, correspondence, funds, loans, liens, mortgage applications, mortgages, notes, payments, property, property records, completed or contemplated transactions, transfers, trusts, and obligations of any nature relating in any way to Irena Mausner.  Further, we request that you identify any entities or individuals who have or have had any role, whether formal or informal, in managing, controlling, or acting as trustee or fiduciary for Irena Mausner or who hold or have held any interest in any way related to Irena Mausner.

SOMF ¶ 39.  According to Plaintiff, Defendant has, to date, "failed to provide a comprehensive accounting."  *Id.* ¶ 40.  Defendant, on the other hand, insists that "he has provided all documents and information within his possession, custody, and control."  Def.'s Resp. to SOMF ¶ 40.

### 3.  The California Properties

Until November 2022, the parties owned an apartment in San Diego, California (the "San Diego Property"), and a house in Carlsbad, California (the "Carlsbad Property"), as tenants-in-common.  SOMF ¶¶ 41, 45.  The parties acquired their interests in the two properties

simultaneously pursuant to grant deeds recorded with the San Diego County Recorder.  *Id.* ¶¶ 43,
46.  Defendant lived at the San Diego Property until it was sold.  *Id.* ¶ 42.  Plaintiff financed the
purchase of the San Diego Property by taking out a mortgage loan and providing the down
payment on the property.  *Id.* ¶ 44.  Plaintiff also made mortgage payments to J.P. Morgan until
sometime in 2022, when she discovered Defendant's actions concerning Robinhood Account A
and her J.P. Morgan IRA.  *Id.*; *see also* Pl.'s Mem. 5.

### a. Mortgage-Related Documents Submitted Without Plaintiff's Knowledge

In late 2022, Defendant submitted several documents to J.P. Morgan, purportedly by or
on behalf of Plaintiff, granting himself increasing levels of authority in connection with the
mortgage for the San Diego Property, all without Plaintiff's knowledge.

First, in August and September of 2022, Defendant filed three "Request for Mortgage
Assistance" forms with respect to the San Diego Property.  SOMF ¶¶ 47, 51, 62; *see* Requests
for Admission ¶¶ 55-60.  The forms bore both parties' signatures and listed Defendant's
cellphone number as Plaintiff's.  SOMF ¶¶ 48-49, 52-53, 63-64.  Second, on August 29, 2022,
Defendant faxed a letter, again purportedly from Plaintiff, to J.P. Morgan granting Defendant
"full access to discuss with [J.P. Morgan] and make decisions regarding any modifications or
restricting that [J.P. Morgan] can offer for [the] mortgage."  *Id.* ¶ 55.  The letter also requested
that all correspondence relating to the mortgage for the San Diego Property be sent to the
Property, where Defendant was then residing, and that all calls concerning the mortgage be
directed to Defendant's cellphone.  *Id.* ¶ 56.  Third and finally, on or about September 13, 2022,
Defendant faxed another letter, once again purportedly from Plaintiff, to J.P. Morgan granting
Defendant "full access . . . to discuss the mortgage and consider any loan modifications,
forebearance [sic] or reductions in our request for mortgage assistance," and requesting that all e-

mails, calls, and mail about the mortgage be directed to Defendant's e-mail address, phone number, and residence, respectively.  *Id.* ¶¶ 58-59.  All of these documents were signed without Plaintiff's authorization using a signature stamp.  *Id.* ¶¶ 50, 54, 57, 60, 65; *see* Requests for Admission ¶¶ 58-60, 62-64.  Both the August 29, 2022 letter and the September 13, 2022 letter were faxed from an Office Depot near the San Diego Property, where Defendant was residing at the time.  SOMF ¶ 61.

According to Plaintiff, a J.P. Morgan representative called Defendant's cellphone in September 2022, attempting to reach Plaintiff about one of the mortgage assistance applications.  *Id.* ¶ 66; *see* Requests for Admission ¶ 65.  During this call, which was recorded, Defendant impersonated Plaintiff, answering yes when the representative asked if she was speaking to "Irena Mausner" and referring to "Ian Mausner" in the third person.  *Id.* ¶ 67; *see* Requests for Admission ¶¶ 66-68; ECF No. 81-27.  Plaintiff did not authorize Defendant to communicate with J.P. Morgan concerning the mortgage on the San Diego Property.  *See* SOMF ¶ 68; Requests for Admission ¶ 68.

**b. Defendant's Alleged Attempts to Steal Plaintiff's Interest in the Properties**

On August 25, 2022, grant deeds purportedly transferring Plaintiff's interests in the San Diego Property and the Carlsbad Property to Defendant for no valuable consideration (the "Fraudulent Grant Deeds") were recorded with the San Diego County Recorder.  SOMF ¶¶ 70, 72.  Both deeds were signed using a signature stamp bearing Plaintiff's name and recorded by "GODEEDS, INC. Attn: LegalZoom Dept."  *Id.* ¶¶ 71, 73, 74.  Two days earlier, Defendant had paid LegalZoom $422 and $404 with his debit card to record the two deeds.  *Id.* ¶ 69; *see* Requests for Admission ¶¶ 78-79.  Additionally, the Fraudulent Grand Deeds were notarized with a notary stamp bearing the name of Defendant's ex-employee and friend.  SOMF ¶ 75.

Defendant claims that he "does not recall having seen these documents prior to his October 30, 2023 deposition," Def.'s Resp. to SOMF ¶ 76, but he has admitted that he "caused [the deeds] to be recorded without Plaintiff's authorization," Requests for Admission ¶ 80.

Several days later, on August 29, 2022, Plaintiff executed her own quitclaim deeds transferring her interests in the two California properties from herself to her revocable trust. SOMF ¶ 77. These hand-signed quitclaims deeds were recorded on September 14, 2022, with the San Diego County Recorder. *Id.* ¶¶ 78-79. Thereafter, Defendant signed a Residential Listing Agreement for the San Diego Property, listing himself as its sole owner and seller. *Id.* ¶ 80; *see* Requests for Admission ¶¶ 82-84. Plaintiff's exhibits show that on or about September 25, 2022, a potential buyer made an offer on the San Diego Property, listing Plaintiff's revocable trust as the seller, SOMF ¶¶ 81-82; Defendant signed the potential buyer's offer on behalf of Plaintiff's revocable trust and made a counteroffer containing, among others, a term that the "Name of Seller [] be changed on Residential Purchase Agreement and all other documentation to Ian O. Mausner," *id.* ¶ 84; *see* Requests for Admission ¶¶ 86-90. After Defendant sent Plaintiff the signed offer and counteroffer, Plaintiff obtained title reports for the properties and discovered the Fraudulent Grand Deeds. SOMF ¶¶ 86-87.

On October 18, 2022, after being confronted with the Fraudulent Grant Deeds by Plaintiff's counsel, Defendant signed a quitclaim deed for each property. *Id.* ¶ 88; *see* Requests for Admission ¶ 95. These quitclaim deeds stated that Defendant's Fraudulent Grant Deeds were "filed without the authorization of tenant-in-common Irena K. Mausner and [were] not signed by Irena K. Mausner" and that "[t]he instant quitclaim deed[s] [are] intended to clarify that the grantees maintain their respective ownership rights and interests in the propert[ies] as if the [Fraudulent Grant Deeds were] never recorded." SOMF ¶¶ 89, 91. These quitclaim deeds were

recorded with the San Diego County Recorder on October 19, 2022 (for the San Diego Property) and February 6, 2023 (for the Carlsbad Property). *Id.* ¶¶ 90, 92.

### 4. Defendant's Sale of Plaintiff's Colgate-Palmolive Stock

In May 2022, Defendant opened an Everyday Checking account at Wells Fargo in both parties' names (the "Fraudulent Wells Fargo Account"). *Id.* ¶ 101; *see* Requests for Admission ¶¶ 39-42. Defendant listed Defendant's address and telephone number as Plaintiff's on the account opening paperwork and signed the paperwork using a signature stamp bearing Plaintiff's name. SOMF ¶¶ 102-04; Requests for Admission ¶¶ 44-46.

On or about May 24, 2022, Plaintiff received a letter from Computershare notifying her that someone had "recent[ly] request[ed] to update [her] security access with Computershare." SOMF ¶ 107. Defendant had changed the e-mail address and mailing address associated with Plaintiff's Computershare account to his own e-mail address and mailing address. *Id.* ¶ 108. A few days later, on May 31, 2022, Defendant liquidated all of the Colgate-Palmolive shares in Plaintiff's Computershare account. *Id.* ¶ 109; *see* Requests for Admission ¶¶ 103-04. On June 6, 2022, Defendant deposited a check made out to Plaintiff in the amount of $50,375.80, representing the proceeds of that sale, into the Fraudulent Wells Fargo Account at a Wells Fargo branch store in El Camino Real Carlsbad, California. SOMF ¶¶ 110-12; *see* Requests for Admission ¶¶ 105-09. Throughout that June, the Fraudulent Wells Fargo Account accrued charges for thousands of dollars for dry cleaning, sushi, and home repair in the San Diego area. SOMF ¶¶ 113-15, 119. Money in the account was also transferred to Defendant's personal accounts at Wells Fargo, Comerica, and City National Bank in tranches of $500, $32,000, and $1,500 respectively. *Id.* ¶¶ 116-18; *see also* Requests for Admission ¶¶ 110-17. Not long after the $32,000 was transferred to his Comerica account, Defendant took a honeymoon to Dubai, the

Maldives, and Croatia, spending upwards of $16,000 to stay at the Four Seasons in the Maldives and $8,300 for airline tickets.  SOMF ¶¶ 120-22.

## 5.  Defendant's Interception of Plaintiff's Long-Term Care Insurance Checks

On or about September 25, 2022, Defendant changed Plaintiff's official United States Postal Service ("USPS") mailing address from her apartment in Manhattan to the San Diego Property, where Defendant was then residing.  *Id.* ¶ 94; *see* Requests for Admission ¶¶ 98-99. On October 27, 2022, Defendant paid USPS with his Comerica debit card to change Plaintiff's official USPS mailing address from her apartment in Manhattan to the address to which Defendant had moved after the sale of the San Diego Property.  SOMF ¶¶ 95-97; *see* Requests for Admission ¶¶ 100-102.  The "start date" associated with the change of address was November 3, 2022, the date on which the San Diego Property was sold.  SOMF ¶¶ 98-99.

Beginning in July 2022, Plaintiff received long-term care insurance checks on approximately a weekly basis.  *Id.* ¶ 125.  On September 27, 2022, and October 6, 2022, Continental Casualty Company mailed checks for about $3,500 each (the "Continental Checks") to Plaintiff's Manhattan address.  *Id.* ¶¶ 126-27.  Because Plaintiff's USPS address had been changed, the Continental Checks were delivered to the San Diego Property, where Defendant was then residing.  *Id.* ¶ 128.  Defendant then deposited the checks into the Fraudulent Wells Fargo Account.  *Id.* ¶¶ 129, 133; *see* Requests for Admission ¶¶ 118-21.  According to Plaintiff, both checks were endorsed using a signature stamp bearing Plaintiff's name.  SOMF ¶¶ 130, 134; *see* Requests for Admission ¶¶ 122-24.  Throughout October 2022, multiple transfers ranging in amount from $12 to $3,550 were made from the Fraudulent Wells Fargo Account to Defendant's various personal accounts at Wells Fargo.  SOMF ¶¶ 131-32, 135-36; *see* Requests for Admission ¶¶ 127-29.

### 6. Defendant's Use of a Credit Card in Plaintiff's Name

Finally, on or about May 21, 2022, Defendant opened a Capital One credit card with an account number ending in -9651 (the "Capital One credit card") in Plaintiff's name, without her authorization. SOMF ¶ 138; Requests for Admission ¶ 47-49. The billing address associated with the Capital One credit card was the San Diego Property, Defendant's then-home address. SOMF ¶ 139. Between May 30, 2022, and June 8, 2022, the Capital One credit card was used to make purchases totaling $13,734.72, including at a movie theater in San Diego. *Id.* ¶¶ 140-49; Requests for Admission ¶¶ 51-52. On June 2, 2022, the credit card was used to pay for a taxi ride in Queens, New York, where two major airports are located. *Id.* ¶¶ 145-47. On that same day, Defendant traveled from California to New York City. *Id.* ¶ 148. Defendant's opening of the Capital One credit card resulted in unauthorized and involuntary transmissions of Plaintiff's information to consumer reporting agencies. *Id.* ¶¶ 151-52; Requests for Admission ¶¶ 52-54.

## C. Procedural History

Plaintiff filed this action on behalf of herself and her revocable trust on February 6, 2023. *See* ECF No. 1. In the operative Amended Complaint, Plaintiff brings twelve claims, for an equitable accounting (Count I); breach of fiduciary duty in Defendant's capacities as Plaintiff's financial advisor and son (Count II); breach of fiduciary duty in Defendant's capacity as a tenant-in-common (Count III); conversion of assets transferred into Robinhood Account A (Count IV); conversion of the $100,000 in Plaintiff's J.P. Morgan IRA (Count V); conversion of Plaintiff's Colgate-Palmolive stock (Count VI); conversion of Plaintiff's long-term care insurance checks (Count VII); slander of title as to the San Diego Property (Count VIII) and the Carlsbad Property (Count IX); fraud (Count X); violation of the New York Fair Credit Reporting

Act ("NYFCRA"), N.Y. Gen. Bus. L. §§ 380-S, 380-L (Count XI); and unjust enrichment (Count XII).  *See* ECF No. 10, ¶¶ 124-217.

Defendant initially proceeded *pro se*.  After an aborted settlement in principle, however, Defendant retained counsel and answered the Amended Complaint.  *See* ECF Nos. 40, 41, 43, 54, 60.  The parties then commenced discovery.  On December 4, 2023, Plaintiff requested a stay of discovery and leave to file an early motion for summary judgment, citing "the overwhelming evidence of Defendant['s] . . . unlawful conduct and liability, including, but not limited to, the fact that [Defendant] did not advance any viable defenses during his deposition."  ECF No. 74.  After reviewing both parties' letter briefs concerning Plaintiff's requests, the Court concluded that "the right balance in these circumstances is to allow Plaintiff to file an early motion for summary judgment, but not to stay discovery."  ECF No. 77.  Plaintiff then filed a motion for summary judgment.  ECF No. 78.  After completing the briefing in opposition to Plaintiff's motion for summary judgment, Defendant's counsel moved to withdraw from the case, citing "Defendant's inability and/or unwillingness to compensate [them] for [their] services."  ECF No. 86.  Upon Defendant's consent, ECF No. 88, the Court granted the withdrawal motion and Defendant returned to *pro se* status, ECF No. 92, which he has maintained to date.

On April 1, 2024, Defendant filed a letter motion to compel discovery (including depositions) regarding communications between Plaintiff and her son-in-law, daughter, and various bankers.  ECF No. 97 ("Def.'s Letter Motion"), at 1-4.  Defendant also requested an extension of fact discovery, which had closed on March 29, 2024, *see* ECF No. 73, at 2, and an order imposing sanctions on Plaintiff's counsel for their "unethical, improper, and/or illegal" conduct during the course of discovery and settlement negotiations.  Def.'s Letter Motion 4-5.  Plaintiff filed a letter opposing Defendant's requests, and Defendant filed a reply.  *See* ECF Nos.

99, 100.  On April 8, 2024, Defendant filed another letter motion "requesting [] summary judgement in favor of [him]," "dismissing all claims."  ECF No. 103, at 1-4.

Thereafter, the case was put on hold while the parties, at the Court's urging, made a "final push for settlement."  ECF No. 104.  After two months of protracted negotiations and interventions by the Court, *see, e.g.*, ECF Nos. 106, 108, 109, 114, 124, 125, the parties reported that they had failed to reach a settlement, *see* ECF No. 130.  In light of that, and "in the interest of making up for lost time," the Court advised that it would turn to Plaintiff's motion for summary judgment, Defendant's letter motion regarding discovery and sanctions, and Defendant's letter motion for summary judgment after they were fully briefed.  ECF No. 131. All three motions are now ripe for decision.  *See* ECF Nos. 134, 136.

## MOTIONS FOR SUMMARY JUDGMENT

The Court begins with the parties' cross-motions for summary judgment.

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects*

*Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex Corp.*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When both sides move for summary judgment, as here, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (internal quotation marks omitted). To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

Finally, it is well established that courts must give "special solicitude to *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). That special solicitude does not apply to Defendant's opposition to Plaintiff's summary judgment motion — which was filed by counsel when he was represented — but it does apply to all his other motions papers. Accordingly, those papers are to be read liberally and interpreted to "raise the strongest arguments that they suggest." *Clinton v. Oppenheimer & Co.*, 824 F. Supp. 2d 476, 481 (S.D.N.Y. 2011) (internal quotation marks omitted). This special solicitude is not unlimited, however, and does not "relieve" a *pro se* party of his "duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 50 (2d Cir. 2003) (internal

quotation mark omitted).  Nor is the "duty to liberally construe a [*pro se* party's submission] . . . the equivalent of a duty to re-write it."  *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (quoting 2 *Moore's Federal Practice* § 12.34[1] [b], at 12-61).

      Plaintiff and Defendant each move for summary judgment on all claims.  *See* Pl.'s Mem.; Def.'s Mem. 4.  The Court will thus address each claim in turn, weighing the two parties' arguments for summary judgment simultaneously.

## A.  Counts III, VIII, and IX: The California Property Claims

      First, Plaintiff brings claims for breach of fiduciary duty (Count III) and slander of title (Count VIII for the San Diego Property and Count IX for the Carlsbad Property) in connection with the Fraudulent Grant Deeds.  As the parties agree, California law applies to these claims. *See* Pl.'s Mem. 11-15; Def.'s Opp'n 6 n.1.  To prevail on a breach of fiduciary duty claim under California law, a plaintiff must show "a fiduciary relationship, breach of fiduciary duty, and damages proximately caused by the breach."  *Groves v. Groves*, No. S181781, 2012 WL 5504782, at *9 n.6 (Cal. Ct. App. Nov. 14, 2012) (unpublished) (citing *Oasis West Realty, LLC v. Goldman*, 51 Cal.4th 811, 820 (2011)).  To establish slander of title, a plaintiff must show "(1) a publication, (2) which is without privilege or justification, (3) which is false, and (4) which causes direct and immediate pecuniary loss."  *Klem v. Access Ins. Co.*, 17 Cal. App. 5th 595, 612 (Cal. Ct. App. 2017) (internal quotation marks omitted).

      Many of these elements are conceded or at least undisputed.  For starters, Defendant wisely concedes that he owed Plaintiff fiduciary duties with respect to the California properties as her tenant-in-common.  *See* Def.'s Opp'n 7; Requests for Admission ¶ 3; *see also, e.g.*, *Bardis v. Oates*, 119 Cal. App. 4th 1, 13 n.5 (Cal. Ct. App. 2004).  Additionally, he neither argues that Plaintiff has failed to establish the first three elements of her slander-of-title claims nor responds

to any of Plaintiff's arguments about them.  *See* Def.'s Opp'n 7-8; Def.'s Mem. 1-2.

Understandably so.  Defendant's purported lack of memory aside, it is undisputed that Defendant

paid GoDeeds and LegalZoom to record the Fraudulent Grant Deeds in August 2022, *see* SOMF

¶¶ 70-74; Requests for Admission ¶ 79; signed those deeds using a stamp bearing Plaintiff's

signature and notarized with a notary stamp bearing the name of Defendant's ex-employee and

friend, *see* SOMF ¶¶ 74-75; Requests for Admission ¶¶ 74-77; and did so in order to transfer

Plaintiff's interests in the California properties to Defendant for no valuable consideration

without Plaintiff's knowledge, SOMF ¶¶ 70, 76.

Further, Defendant has admitted that he took these actions without Plaintiff's

authorization.  *See* Requests for Admission ¶¶ 76, 80.  And even without that admission, the

vague responses that Defendant does provide on this topic are not sufficient to raise any genuine

disputes of material fact.  For example, in response to Plaintiff's factual statement that she "did

not authorize [Defendant] to execute or record the Fraudulent Grant Deeds," SOMF ¶ 76,

Defendant merely retorts that this "contention is made solely by her counsel's reference to a

document authored by counsel, as opposed to a witness with direct knowledge of the fact

alleged," Def.'s Resp. to SOMF ¶ 76, and that Plaintiff "was — and continues to be — unduly

influenced by Nicole," *id.* ¶ 39.  But neither of these arguments has anything to do with how

Defendant should have understood his authority (or lack thereof) with respect to Plaintiff's

interests in the California properties in light of the May 2, 2022 Letter.  Moreover, Defendant

himself "acknowledges that [Plaintiff's] litigation counsel sent the" May 2, 2022 Letter

informing him that he had no authority to act on Plaintiff's behalf, Def.'s Resp. to SOMF ¶ 36,

and that Plaintiff's counsel reiterated that admonition to Defendant multiple times thereafter, *see*

*id.* ¶ 38; *see also* Requests for Admission ¶ 4; ECF Nos. 81-16, 81-17.  Defendant does not —

because he cannot — offer any evidence showing that Plaintiff authorized him otherwise in connection with the California properties.  To the contrary: Defendant attested in both quitclaim deeds that the Fraudulent Grant Deeds were "filed without the authorization of [Plaintiff] and [were] not signed by [her]."  ECF Nos. 81-39, 81-40.

That is also enough to settle any dispute regarding the second element of Plaintiff's claim for breach of fiduciary duty.  *See, e.g.*, *Cheroff v. Schneider*, No. A120192, 2008 WL 4998360, at *9 (Cal. Ct. App. Nov. 25, 2008) (affirming the trial court's finding on summary judgment that the defendant had "breached her fiduciary duty . . . as co-owner of the . . . property . . . by concealing . . . her adverse claim to ownership of 50 percent of that property"); *cf. Shaffer v. Wallace*, No. B189371, 2007 WL 2773841, at *5 (Cal. Ct. App. Sept. 25, 2007) (noting that a co-owner is "bound to act in the highest good faith to his [co-owner] and may not obtain any advantage over him . . . by the slightest misrepresentation, concealment, threat or adverse pressure of any kind").  Defendant nevertheless argues that Plaintiff cannot establish a breach because the California properties were eventually sold under their joint ownership and "*attempting* to sell real property can[not] give rise to a claim for breach of fiduciary duty." Def.'s Opp'n 6; *see also* Def.'s Mem. 2.  But this argument is difficult to take seriously. Separate and apart from Defendant's alleged attempt to sell the California properties without Plaintiff's knowledge, Defendant does not dispute that he did, in fact, file the Fraudulent Grant Deeds in an effort to steal Plaintiff's interests in the California properties.  Needless to say, that is enough to establish that he breached his fiduciary duties.

That leaves damages, which is an element of both breach of fiduciary duty and slander of title.  Contrary to (what appears to be) Defendant's assertions, Plaintiff does not seek to recover attorney's fees incurred in the instant litigation.  *See* Def.'s Opp'n 7; ECF No. 94 ("Pl.'s Reply"),

at 4.  Instead, other than punitive damages (to which Plaintiff may be entitled if she is able to

establish all of the elements of the claims), Plaintiff seeks damages in the amount of the

"significant legal fees and expenses in clearing the cloud on title created by the Fraudulent Grant

Deeds."  Pl.'s Mem. 13-14 (breach of fiduciary duty); *see id.* at 15 (slander of title).[1]  Such

damages are recoverable for both breach of fiduciary duty and slander of title.  *See Howell v.*

*Hamilton Meats & Provisions, Inc.*, 52 Cal. 4th 541, 551 (2011) ("[T]he measure of damages

generally recoverable in tort is the amount which will compensate for all the detriment

proximately caused by the tort." (cleaned up)); *Klem*, 17 Cal. App. 5th at 624 (noting that a

plaintiff in a slander-of-title action may recover "the expense of legal proceedings necessary to

remove the doubt cast by the disparagement").

That said, Defendant is correct on two scores.  First, Plaintiff is not entitled to recover the

costs of recording her own quitclaim deeds to transfer her interests in the California properties

from herself to her revocable trust, *see* SOMF ¶ 77, because she incurred those costs before she

discovered Defendant's Fraudulent Grant Deeds, *see* Pl.'s Mem. 6; Def.'s Opp'n 7; *Serv. by*

*Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807, 1819 (Cal. Ct. App. 1996) (denying

damages for "detriment [not] proximately caused" by the defendant).  Second, Plaintiff "does not

quantify her purported damages," other than to point to the fees listed on the quitclaim deeds that

undid the Fraudulent Grant Deeds — $115 and $118, respectively.  Def.'s Opp'n 6; *see* Pl.'s

Reply 4-5; ECF Nos. 81-39, 81-40.  But neither shortcoming is enough for Defendant to defeat

---

[1]      It appears that Plaintiff has also demanded that Defendant return the proceeds of the sale
of at least one of the California properties being held in escrow.  *See* ECF No. 104.  But Plaintiff
does not mention these proceeds in her discussion of the proper damages for Counts III, VIII,
and IX.  In any case, those proceeds would be irrelevant for the purposes of the above claims
about the California properties because the quitclaim deeds undid the Fraudulent Grant Deeds
and the properties were sold by the parties as tenants-in-common.

Plaintiff's motion for summary judgment. Defendant cites *New York City Transit Authority v. Express Scripts, Inc.*, No. 19-CV-5196 (JMF), 2022 WL 3577426 (S.D.N.Y. Aug. 19, 2022), to argue that Plaintiff's "failure to calculate the purported harm she suffers is reason enough to" deny her motion for summary judgment as to Counts III, VIII, and IX, Def.'s Opp'n 6-7, but that case actually stands for the opposite proposition. That is, "although damages must be *reasonably certain* . . . , certainty, as it pertains to general damages, refers to the *fact* of damage, not the amount." *Express Scripts, Inc.*, 2022 WL 3577426, at *3 (internal quotation marks omitted). Here, Defendant does not dispute that Plaintiff facilitated and paid for the execution and recording of the quitclaim deeds that undid his Fraudulent Grant Deeds. Def.'s Resp. to SOMF ¶¶ 88-93. That is enough to establish "the *fact* of damage," even if "not the amount," and to defeat Defendant's argument that the "issue is absolutely moot since both parties agreed to updated deeds on both properties before they were sold." Def.'s Mem. 2.

Accordingly, Plaintiff's motion for summary judgment is granted with respect to Counts III, VIII, and IX (but only as to liability), and Defendant's motion for summary judgment as to those Counts is and must be denied.

## B. Counts VI and VII: Conversion of the Colgate-Palmolive Stock and Long-Term Care Insurance Payments

Next, Plaintiff brings claims for conversion of her Colgate-Palmolive stock (Count VI) and long-term care insurance payments (Count VII). To prevail on these claims, which are governed by New York law, Plaintiff must prove "(1) [her] possessory right or interest in the property and (2) [D]efendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50 (2006) (citation omitted). "The usual measure of damages for conversion is the value of the property at

the time and place of conversion, plus interest." *Scotti v. Barrett*, 88 N.Y.S.3d 44, 45 (2d Dep't 2018) (internal quotation marks omitted).

Plaintiff's motion is easily granted as to both claims of conversion. It is undisputed that Plaintiff had legal ownership of the Colgate-Palmolive stock and the long-term care insurance checks from Continental Casualty Company, *see* Def.'s Resp. to SOMF ¶¶ 105-16, 124-27; that Defendant used his access to Plaintiff's Computershare account to sell Plaintiff's Colgate-Palmolive stock without her knowledge, *see id.* ¶¶ 107-09; Requests for Admission ¶¶ 103-04; that Defendant diverted the Continental Checks from Plaintiff's Manhattan apartment to his San Diego address by changing Plaintiff's official USPS address without her knowledge, *see* Def.'s Resp. to SOMF ¶¶ 94-98; Requests for Admission ¶¶ 98-102; that Defendant opened the Fraudulent Wells Fargo Account without Plaintiff's knowledge, *see* Def.'s Resp. to SOMF ¶¶ 101-04; Requests for Admission ¶¶ 44-46; and that Defendant deposited the proceeds of the stock sale and the Continental Checks into the Fraudulent Wells Fargo Account, which he used to make various purchases and from which he transferred funds to his personal bank accounts, *see* Def.'s Resp. to SOMF ¶¶ 109-22, 129-36; Requests for Admission ¶¶ 105-117.[2] These facts amply establish both elements of conversion as to both the Colgate-Palmolive stock and the Continental Checks.

Defendant's opposition to Plaintiff's motion for summary judgment and his own motion for summary judgment offer just one argument in response to this robust record: that Defendant took these actions with Plaintiff's authorization. *See* Def.'s Opp'n 8-9; Def.'s Mem. 3. In

---

[2]    Defendant's argument that "[t]here is nothing wrong" with depositing Plaintiff's long-term care insurance checks into a joint bank account is borderline frivolous, as it ignores the fact that the Fraudulent Wells Fargo Account was opened without Plaintiff's knowledge and that Defendant proceeded to spend the funds deposited into that account. Def.'s Mem. 3.

support of this argument, Defendant offers that the sale of the Colgate-Palmolive stock "was part of a long-term sales plan that [the parties] coordinated over a period of years," Def.'s Opp'n 8; that he historically "initiated . . . ALL [sic]" such transactions on Plaintiff's behalf, *id.*; and that he was explicitly authorized to take all of the above actions by a New York Statutory Short Form Power of Attorney (the "N.Y. POA"), *see* Def.'s Mem. 3; ECF No. 103, at 6-12. But none of these arguments are sufficient to raise a genuine dispute as to Defendant's (lack of) authority, let alone to grant summary judgment in his favor. To begin, Defendant ignores the fact that Plaintiff informed him that he had no authority to act on her behalf through the May 2, 2022 Letter, merely weeks before Defendant proceeded to sell Plaintiff's Colgate-Palmolive stock and a few months before he started intercepting the Continental Checks. Defendant does not supply any evidence of a new authorization postdating May 2, 2022, even though he represents that he disclosed "all documents and information within his possession, custody, and control." Def.'s Resp. to SOMF ¶ 40.

Meanwhile, the N.Y. POA explicitly requires the approval of Defendant's sister and co-agent, Nicole Mausner, and prohibits the use of Plaintiff's assets to "benefit [Defendant] . . . or make gifts to [Defendant] . . . unless [Plaintiff] has specifically granted [him] that authority in [the POA]." ECF No. 103, at 2, 6-7, 11. Defendant does not — because he cannot — argue, let alone show, that he acted with Nicole's consent or that the N.Y. POA itself authorized his self-dealing actions. *See* Mausner Dep. 189 ("Q: Do you have any basis to think that you were authorized to cash your mother's disability checks? A: I don't remember."). Thus, there is no genuine dispute that Defendant lacked the authority to exercise dominion over Plaintiff's Colgate-Palmolive stock and long-term care insurance payments. Plaintiff is therefore owed "the value of the property at the time and place of conversion" — namely, $50,375.80 for the

Colgate-Palmolive stock, and $3,503.20 and $3,542.00 for the two Continental Checks, *see* SOMF ¶¶ 110, 126-27 — plus interest. *Scotti*, 88 N.Y.S.3d at 45 (internal quotation marks omitted).

Accordingly, Plaintiff's motion for summary judgment is granted as to Counts VI and VII, and Defendant's motion for summary judgment as to those Counts is and must be denied.

## C. Counts II, IV, V, and X: Claims Relating to the Robinhood Account and the J.P. Morgan IRA

Next, Plaintiff brings claims for breach of fiduciary duty (Count II) and conversion (Counts IV and V) with respect to Defendant's unauthorized transfers of nearly $2 million from Plaintiff's bank accounts — namely, the Robinhood Account and the J.P. Morgan IRA — to his own. She also brings a fraud claim (Count X) based on the Unofficial Robinhood Statement. The Court considers each claim in turn.

### 1. Count II: Breach of Fiduciary Duty

Plaintiff's fiduciary duty claims with respect to the Robinhood Account and the J.P. Morgan IRA are governed by New York law. The elements of a cause of action for breach of fiduciary duty in New York, however, are the same as they are in California. To establish a breach of fiduciary duty, a plaintiff must prove "the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly cause by the defendant's misconduct." *Kurtzman v. Bergstol*, 835 N.Y.S.2d 644, 646 (2d Dep't 2007).

Defendant does not dispute that he owed Plaintiff fiduciary duties as her son and financial advisor. *See* Def.'s Opp'n 9, 12; Requests for Admission ¶ 2; *see also, e.g.*, *Braddock v. Braddock*, 871 N.Y.S.2d 68, 72 (1st Dep't 2009) ("Family members stand in a fiduciary relationship toward one another in a co-owned business venture."). Instead, he once again offers a coterie of insufficient reasons why he was in fact authorized to make the transfers at issue. *See*

Def.'s Opp'n 9-10, 12; Def.'s Mem. 2-3. First, Defendant points to the N.Y. POA and a separate J.P. Morgan Power of Attorney form (the "J.P. Morgan POA") as sources of his authority. But, as discussed above, his reliance on the N.Y. POA is misplaced. Meanwhile, the J.P. Morgan POA is not even complete — none of the signatures are notarized or witnessed as required by the form — and thus could not have been in effect at the time Defendant transferred $100,000 out of Plaintiff's J.P. Morgan IRA without her knowledge. *See* ECF No. 103, at 19-23; *see also* Pl.'s Opp'n 3 n.1.[3] Second, Defendant argues that Plaintiff "frequently authorized [him] to act on her behalf in every manner of banking transaction [sic]" and that the parties "often commingled assets and investments." Def.'s Opp'n 9. But Defendant fails to put forth any evidence that Plaintiff specifically authorized *even one* of the various transfers at issue — namely, the "dozens of discrete, identifiable transactions" that "caused more than $1.7 million to be transferred" into Robinhood Account A, SOMF ¶ 14, and the transfer of $100,000 from Plaintiff's J.P. Morgan IRA into Defendant's personal bank account at Wells Fargo, *see id.* ¶ 33.

Third and finally, Defendant argues that, as far as Robinhood Account A is concerned, Plaintiff knew that the account was in his name only. *See* Def.'s Mem. 3. In support of that argument, Defendant offers four "key sample e-mails [from Plaintiff] of many hundreds." ECF No. 103, at 24. In these e-mails (purportedly sent between September and December 2021), Plaintiff variously refers to the Robinhood Account A as "your account" and "your (our) account." *See id.* at 24-27. In evaluating the parties' motions, however, the Court "properly considers only evidence that would be admissible at trial," and these purported e-mails do not

---

[3]    Defendant's reliance on the J.P. Morgan POA is also belied by his assertion that "[J.P.] Morgan's system requires verbal approval from the account owner before every movement of any funds." Def.'s Mem. 2. Not for nothing, Defendant offers no evidence that Plaintiff verbally approved his transfer of $100,000 out of Plaintiff's J.P. Morgan IRA.

qualify. For one thing, they were not produced during discovery — even when Defendant was represented by counsel. *See* Pl.'s Opp'n 5 (noting that Defendant's "own former counsel did not produce the [e-mails] as part of his Bates-stamped production or rely on them in opposition to [Plaintiff's] summary judgment motion"); *see John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d 262, 269 n.4 (S.D.N.Y. 2014) (holding that courts cannot consider documents submitted "for the first time" in motion papers). For another, they are unauthenticated. *See, e.g.*, *Olosson v. Vertis Commc'n*, No. 09-CV-5428 (GBD), 2010 WL 5422514, at *2 (S.D.N.Y. Dec. 23, 2010) ("[U]nauthenticated letters[ and] e-mails . . . cannot support a summary judgment motion."). The belated appearance of these purported e-mails is especially troubling given Defendant's insistence, at the time that he filed his opposition to Plaintiff's motion, that he had "provided all documents and information within his possession, custody, and control." Def.'s Resp. to SOMF ¶ 40. In short, because the e-mails are "not part of the evidentiary record," they "may not be considered by the Court." *Stengel v. Black*, No. 03-CV-0495 (GEL), 2004 WL 1933612, at *4 (S.D.N.Y. Aug. 30, 2004) (Lynch, J.). Accordingly, Defendant fails to establish a genuine dispute regarding — let alone prove — his authority to make the transfers at issue.

In the absence of any evidence establishing Defendant's authority, the undisputed facts amply establish that Defendant engaged in misconduct with respect to Robinhood Account A and Plaintiff's J.P. Morgan IRA. As to Robinhood Account A, Defendant transferred more than $1.7 million in total from Plaintiff's bank accounts to Robinhood Account A, an account solely under his name, *see* Def.'s Resp. to SOMF ¶¶ 14, 15; instructed Plaintiff to "just say yes to everything [her bankers] ask" and to "just say you are aware of course of the transfers to Robinhood", *id.* ¶ 24 (alterations accepted); falsely represented to Plaintiff that Robinhood Account A was an "Irena Mausner Account," *id.* ¶¶ 16-17; and ultimately admitted that Plaintiff

is entitled to the money that was transferred into Robinhood Account A, *see* SOMF ¶ 27; Mausner Dep. 300, 324-28, 330.[4]  As to the J.P. Morgan IRA, Defendant knew the password to Plaintiff's IRA account, *see* Def.'s Resp. to SOMF ¶¶ 30-31; there was an unauthorized transfer of $100,00 from Plaintiff's J.P. Morgan IRA to Defendant's bank account at Wells Fargo, *see id.* ¶¶ 32-33; Requests for Admission ¶¶ 8, 11-12, 28; and (reflecting a modus operandi of sorts) the delivery instructions for the $100,000 transfer listed the "Beneficiary Name" as "Irena K Mausner IRA" and the "Beneficiary Bank Account" as "Irena K Mausner IRA," Def.'s Resp. to SOMF ¶ 34.  Based on these facts, "no rational jury could" find that Defendant did not make these transfers himself, let alone that he did so with Plaintiff's authorization.  *See McCarthy-O'Keefe v. Local 298*, No. 13-CV-4785 (JMF), 2015 WL 783352, at *7 (S.D.N.Y. Feb. 24, 2015).  Plaintiff has thus established the second element of her fiduciary duty claim.  *See, e.g.*, *City of Binghamton v. Whalen*, 32 N.Y.S.3d 727, 728-29 (3d Dep't 2016) (holding that evidence of theft of "more than $50,000 from plaintiff over the course of a nearly six-year period . . . established plaintiff's entitled to judgment as a matter of law" on breach of fiduciary duty).

That leaves the issue of damages.  Defendant does not even respond to Plaintiff's argument regarding damages with respect to the claim for breach of fiduciary duty relating to the J.P. Morgan IRA and thus appears to concede that Plaintiff is entitled to the $100,000 (plus interest) that was transferred out of her J.P. Morgan IRA account.  *See* Pl.'s Mem. 19; Def.'s Opp'n 9-10.  As for the money that Defendant transferred to Robinhood Account A, Defendant argues that Plaintiff "cannot claim entitlement to [the whole] $1.7 million even if [she is]

---

[4]    Defendant now claims that he "never said that [Plaintiff] is 'entitled' to the funds from the Robinhood account."  ECF No. 136 ("Def.'s Reply"), at 1.  But Defendant "may not create an issue of fact by contradicting [his] previous deposition testimony."  *Maxwell v. City of New York*, 380 F.3d 106, 109 (2d Cir. 2004) (cleaned up).

successful" on her claims of breach of fiduciary duty and conversion because "Robinhood Account A suffered investment-related losses," not losses from Defendant's spending. Def.'s Opp'n 13; *see also* Def.'s Mem. 2-3. But this argument also borders on frivolous. The breach was complete at the moment of the transfers, and the proper remedy is to restore Plaintiff to the position she would have been in absent the transfers. *See, e.g.*, *Bank of Am. Corp. v. Braga Lemgruber*, No. 02-CV-1041 (DAB) (THK), 2007 WL 4548298, at *8 (S.D.N.Y. July 10, 2007) (holding that the plaintiffs are entitled recover the full sum of the money embezzled by the defendants under their claim for breach of fiduciary duty, because the "appropriate remedy in cases of breach of fiduciary duty is the restoration of the [plaintiffs] to the position they would have occupied but for the breach of trust"), *report and recommendation adopted*, 2007 WL 4510329 (S.D.N.Y. Dec. 20, 2007). She does not bear the risks associated with what Defendant decided to do with the money after he stole it.[5]

Accordingly, Plaintiff's motion for summary judgment is granted as to Count II, and Defendant's motion for summary judgment as to that Count is and must be denied.

**2. Counts IV and V: Conversion**

For the same reasons, Plaintiff's motion for summary judgment is easily granted as to her conversion claims premised on the transfers involving Robinhood Account A and the J.P. Morgan IRA. Defendant does not dispute Plaintiff's "possessory right" over the $100,000 and

---

[5]    In her reply memorandum of law in support of her motion for summary judgment, Plaintiff requests that the Court "order [Defendant] to immediately transfer the current account balance to [Plaintiff] and enter a judgment for the difference between the roughly $1.7 million transferred [] and that balance." Pl.'s Reply 8-9. This relief was not requested in the Amended Complaint (or, for that matter, in Plaintiff's initial memorandum of law) and therefore "will not be considered at this late stage in the case." *Spirit Realty, L.P. v. GH & H Mableton, LLC*, 227 F. Supp. 3d 291, 299 n.5 (S.D.N.Y. 2017). In any case, Plaintiff offers no authority suggesting that such relief would be appropriate here.

$1.7 million or his current "dominion over [that] property." *See Colavito*, 8 N.Y.3d at 50; Def.'s Resp. to SOMF ¶¶ 14-15, 33 (acknowledging that the accounts to which those amounts were transferred from Plaintiff's bank accounts were "solely in [Defendant's] name"). And for the reasons discussed above, the Court must reject Defendant's various arguments and unauthenticated evidence, *see* Def.'s Opp'n 12-14; Def.'s Mem. 2-3, that such dominion is not "in derogation of [P]laintiff's rights" because he was authorized to make the relevant transfers, *See Colavito*, 8 N.Y.3d at 50. Finally, the Court also rejects Defendant's argument that "there is no conversion" as to a portion of the $1.7 million that was "lost accidentally" due to fluctuations in the stock market. Def.'s Opp'n 12-13. As discussed above, the relevant conversion happened when Defendant transferred that money into Robinhood Account A without Plaintiff's authorization, not when he apparently lost some of that money in the stock market. *See* Pl.'s Reply 8 n.4. Plaintiff is therefore entitled to the $100,000 transferred out of the J.P. Morgan IRA and the $1.7 million transferred into Robinhood Account A.

Accordingly, Plaintiff's motion for summary judgment is granted as to Counts IV and V, and Defendant's motion for summary judgment as to those Counts is and must be denied.

### 3. Count X: Fraud

The same cannot be said for Plaintiff's fraud claim.[6] To recover damages for fraud, a plaintiff must prove "[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it,

---

[6]    In the Amended Complaint, Plaintiff bases her fraud claim not only on Defendant's actions involving the Unofficial Robinhood Statement, but also on his "misstatements and omissions in communications with Computershare, the USPS, Capital One, JPM, and the San Diego County Recorder." Compl. ¶ 205. Plaintiff's motion for summary judgment, however, addresses the fraud claim only insofar as it concerns the Unofficial Robinhood Statement. Pl.'s Mem. 21-24. Accordingly, the Court considers the parties' arguments about Plaintiff's fraud claim only insofar as they relate to the Unofficial Robinhood Statement.

[2] justifiable reliance of the other party on the misrepresentation or material omission, and

[3] injury." *Lama Holding Co. v. Smith Barney Inc.*, 646 N.Y.S.2d 76, 80 (1996). The

undisputed facts amply establish the first of these elements: Defendant sent Plaintiff an e-mail

attaching a document indicating that Robinhood Account A was an "Irena Mausner Account"

even though the account was solely in Defendant's name, *see* Def.'s Resp. to SOMF ¶ 17; he

manipulated that document to resemble an official Robinhood account statement by, among

other things, adding a Robinhood logo, *see id.* ¶ 16; ECF No. 81-3, at 3; and he instructed

Plaintiff to "[j]ust say you are aware of course of the transfers to Robinhood" during a meeting

with one of her bankers, Def.'s Resp. to SOMF. ¶ 22. Although Defendant argues that "the

representations cited in [Plaintiff's] motion are [not] misrepresentations" because "the

information he provided . . . is exactly" the "short-and-sweet summar[y] of investment positions"

requested by Plaintiff, Def.'s Opp'n 14, he offers no evidence of Plaintiff's request for such a

format and, in any case, fails to address why his "summaries" would falsely represent Robinhood

Account A to be an "Irena Mausner Account."

 The second element — justifiable reliance — is where Plaintiff runs into trouble. *See*

Def.'s Opp'n 14-15. Yes, Plaintiff continued to allow more money to be sent to Robinhood

Account A. *See* ECF No. 81-8. But the record does not reveal whether she did so in reliance on

the Unofficial Robinhood Statement and on the understanding that the funds were being

transferred to an "Irena Mausner Account." To be clear, and contrary to what Defendant argues,

that is not because Plaintiff "cannot claim to have been defrauded into making transfers when

she had already made the transfers," Def.'s Opp'n 14, as Defendant does not dispute that

additional money was transferred into Robinhood Account A after that February 16, 2020 e-mail,

*compare* Def.'s Resp. to SOMF ¶ 23, *with id.* ¶¶ 25-26. Instead, it is because Plaintiff has

submitted no evidence — including, but not limited to, a declaration or affidavit from herself or from someone else with "personal knowledge" of whether the transfers were made in justifiable reliance on Defendant's misrepresentations. *Little*, 487 F. Supp. 2d at 433 n.2. Accordingly, Plaintiff's motion for summary judgment is and must be denied as to Count X. At the same time, there is no basis to grant Defendant summary judgment on Plaintiff's fraud claim. In fact, Defendant does not even argue that the claim fails for want of evidence of Plaintiff's justifiable reliance. Nor could he, as Plaintiff can plainly provide such evidence by testifying at trial.

**D. Count XI: The NYFRCA Claim**

Plaintiff's motion for summary judgment must be and is denied with respect to her NYFRCA claim (Count XI) as well. The issue is Plaintiff's failure to point to any damages specific to the claim. Yes, as Plaintiff notes, damages are not an element of a claim brought under the NYFRCA. *See Barash v. Ford Motor Credit Corp.*, No. 06-CV-64979 (JFB), 2007 WL 1791656, at *6 (E.D.N.Y. June 20, 2017). But Plaintiff's failure to establish actual damages raises serious doubts about whether she has standing to bring a claim under the NYFRCA in federal court. *See Landau v. Eisenberg*, 922 F.3d 495, 497 (2d Cir. 2019) (per curiam) ("Before deciding any case [courts] are required to assure [them]selves that the case is properly within [their] subject matter jurisdiction." (alteration accepted and internal quotation marks omitted)); *Wyatt v. Fed. Comm'cn Comm.*, No. 15-CV-1935 (WHP), 2016 WL 4919958, at *3 (S.D.N.Y. Sept. 14, 2016) ("[W]hen a plaintiff lacks standing to bring suit, a court has no subject matter jurisdiction over the case." (internal quotation marks omitted)).

As the Supreme Court held in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 427. It follows that "plaintiffs

cannot establish Article III standing by relying entirely on a statutory violation." *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 64 (2d Cir. 2021). That appears to be what Plaintiff seeks to do here with respect to her NYFRCA claim. If so, *TransUnion* and its progeny compel dismissal (without prejudice) of the claim even though Plaintiff has standing to bring other claims. *See, e.g.*, *Alix v. McKinsey & Co, Inc.*, No. 18-CV-4141 (JMF), 2024 WL 3293621, at *10 (S.D.N.Y. July 3, 2024) (noting that "standing is not dispensed in gross" and "plaintiffs must demonstrate standing for *each claim* that they press and for *each form of relief* that they seek" (quoting *TransUnion LLC*, 594 U.S. at 431)).

That said, Plaintiff has not briefed the question of whether she has standing to bring her claim under the NYFRCA. Assuming she wishes to press the claim here, she shall show cause why it should not be dismissed for lack of subject matter jurisdiction in a letter, not to exceed five pages, within **two weeks** of this Opinion and Order; if she attempts to show cause, Defendant may respond, in a letter not to exceed five pages, within **one month** of the date of this Opinion and Order. In the meantime, both parties' motions for summary judgment are denied as to Count XI.

**E.  Count I and XII: Equitable Accounting and Unjust Enrichment**

Finally, the Court turns to Plaintiff's claims for equitable accounting (Count I) and unjust enrichment (Count XII). Plaintiff's motion for summary judgment is easily granted as to the former. To obtain an equitable accounting "under New York law, a plaintiff must show (1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal." *Koh v. Koo*, No. 22-CV-6639 (JMF), 2023 WL 5352786, at *6 (S.D.N.Y. Aug. 21, 2023) (internal quotation marks omitted).

Of these, the first element is the most important: "where . . . there is a fiduciary relationship

between the parties, there is an absolute right to an accounting notwithstanding the existence of

an adequate remedy at law." *Webster v. Forest Hills Care Ctr., LLC*, 84 N.Y.S.3d 501, 503 (2d

Dep't 2018).  Here, it is undisputed that Defendant had a fiduciary relationship with Plaintiff and

that at least some of Plaintiff's assets remain in Defendant's possession, whether legitimately or

illegitimately.  Furthermore, although Defendant argues that Plaintiff should be denied an

equitable accounting "[g]iven what [he] has already provided[] and what he has committed to

continue providing," the fact that he has handed over some (or even all) of the documents in his

possession fails to establish that he has provided the "accounting" that Plaintiff demanded.

Def.'s Opp'n 16.  Accordingly, and in view of Plaintiff's "absolute right" to an equitable

accounting, Plaintiff's motion for summary judgment is granted as to Count I, and Defendant's

motion for summary judgment is and must be denied as to that count.

By contrast, Plaintiff's claim for unjust enrichment must be and is dismissed as

duplicative of her other tort claims.  *See Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283,

296 (S.D.N.Y. 2015).  Plaintiff fails to point to any "circumstances [that] create an equitable

obligation running from the defendant to the plaintiff" that are distinguishable from those

supporting her tort claims.  *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012); *see* Pl.'s

Mem. 24-25 (recounting the same facts that gave rise to the other tort claims discussed above).

Accordingly, Plaintiff's motion for summary judgment is and must be denied as to Count XI, and

Defendant's motion for summary judgment is granted as to that count.

**F.  Damages and Punitive Damages**

Two brief words are warranted on the subject of damages.  First, on the compensatory

damages front, Plaintiff "may recover only once" for any given harm as "it goes without saying

that the courts can and should preclude double recovery." *Abdou v. Mahany*, No. 19-CV-1824 (PAE), 2021 WL 2650069, at *11 (S.D.N.Y. June 28, 2021) (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002)).  Second, a rational jury could certainly find that Defendant acted with "a wanton or reckless disregard of plaintiff's rights" with respect to her assets.  *Bos. Concessions Grp., Inc. v. Criterion Ctr. Corp.*, 673 N.Y.S.2d 111, 112-13 (1st Dep't 1998).  For that reason, Plaintiff has a strong case for punitive damages in connection with Counts II and III (breach of fiduciary duty), Counts IV, V, VI, and VII (conversion), and Counts VIII and IX (slander of title).  *See* Pl.'s Mem. 14, 15, 19, 21, 23-24.  Under New York and California law, however, "the decision to award punitive damages and their amount are questions which primarily reside in the jury's discretion." *Racich v. Celotex Corp.*, 887 F.2d 393, 397 (2d Cir. 1989); *Margeson v. Ford Motor Co.*, No. B287445, 2020 WL 5641876, at *6 (Cal. Ct. App. Sept. 22, 2020) ("In California, determinations related to assessment of punitive damages have traditionally been left to the discretion of the jury." (quoting *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 821 (1979)) (cleaned up)).  Thus "summary judgment on the issue of punitive damages is inappropriate where there is enough evidence to permit the jury to find that defendants acted with wanton and reckless or malicious intent." *Morales v. Kavulich & Assocs., P.C.*, 294 F. Supp. 3d 193, 199 (S.D.N.Y. 2018).

### DEFENDANT'S MOTION FOR DISCOVERY AND DISCOVERY SANCTIONS

That leaves Defendant's April 1, 2024 letter motion seeking (1) certain discovery (namely, communications between Plaintiff and her son-in-law, daughter, and various bankers and related depositions), (2) an extension of the fact-discovery deadline for such discovery, and (3) sanctions on defense counsel.  Def.'s Letter Motion.  These requests are baseless.  On the discovery front, Defendant had ample opportunity to seek the discovery he now requests prior to

the March 29, 2024 discovery deadline. *See* ECF No. 73, at 2; ECF No. ECF No. 77 (denying

Plaintiff's request to stay discovery pending a ruling on her motion for summary judgment). Yet

he never noticed *any* depositions or served any deposition subpoenas. *See, e.g.*, ECF No. 91, at

2; ECF No. 99, at 2. Nor does he identify any discovery request that Plaintiff failed to

fulfill. Moreover, to the extent that Defendant believed that there were "facts essential" to his

opposition to Plaintiff's motion for summary judgment, Rule 56 provided him with a recourse:

He could and should have filed an affidavit "show[ing] . . . that, for specified reasons," he could

not "present facts essential to justify [his] opposition." Fed. R. Civ. P. 56(d). He did not — even

though, as noted, he was represented by counsel at the time that he filed his opposition to

Plaintiff's motion. That failure "is itself sufficient grounds to reject a claim that the opportunity

for discovery was inadequate." *1077 Madison St., LLC v. Daniels*, 954 F.3d 460, 464 (2d Cir.

2020) (per curiam) (internal quotation marks omitted)); *see e.g.*, *Berry v. Marchinkowski*, 137 F.

Supp. 3d 495, 522-23 (S.D.N.Y. 2015) (citing cases).

Defendant's request for sanctions borders on frivolous. Defendant argues that Plaintiff's

counsel should be sanctioned because they denied him additional time to review a settlement

agreement with an attorney at the court-affiliated Pro Se Clinic and "walked away from the

settlement," Def.'s Letter Motion 4-5, sent "some discovery items which were unopenable," *id.*

at 5, and refused to provide guidance regarding their request that Defendant "do a search with

certain 'terms,'" *id.* None of these constitute grounds for sanctions. First, Defendant does not

deny that Plaintiff's counsel refused to allow Defendant additional time to consult with an

attorney at the Clinic because Defendant "sought to re-trade on one of the agreement's terms" at

the eleventh hour. ECF No. 99, at 3. Nor does his purported behavior following Plaintiff's

counsel's refusal show that he himself was intent on consummating the settlement. According to

Plaintiff's counsel, a mere three days after the breakdown of settlement negotiations, Defendant "revoked the authorization that he had executed as one of the preconditions to settlement, preventing the money from being released to [Plaintiff]." *Id.* Second, Defendant provides no evidence that his technical troubles resulted from wrongdoing or even negligence on the part of Plaintiff's counsel. *See Doug's Word Clocks.com Pty Ltd. v. Princess Int'l, Inc.*, 323 F.R.D. 167, 173 (S.D.N.Y. 2017). Accordingly, Defendant's request for sanctions must be and is denied.

## CONCLUSION

For the reasons set forth above, Defendant's letter motion seeking discovery-related relief and sanctions is DENIED; Plaintiff's motion for summary judgment is GRANTED in all but a few respects; and Defendant's cross-motion for summary judgment is DENIED in all but one respect. More specifically, judgment is GRANTED to Plaintiff as to both liability and damages (save punitive damages) for the following claims:

- Breach of fiduciary duty and conversion based on Defendant's unauthorized transfers of money into Robinhood Account A (Counts II and IV), for which Plaintiff is entitled to damages of $1.7 million plus interest;

- Breach of fiduciary duty and conversion based on Defendant's unauthorized transfers of money out of Plaintiff's J.P. Morgan IRA (Counts II and V); for which Plaintiff is entitled to damages of $100,000 plus interest;

- Conversion of Plaintiff's Colgate-Palmolive stock (Count VI), for which Plaintiff is entitled to damages of $50,375.80 plus interest;

- Conversion of Plaintiff's long-term care insurance checks (Count VII), for which Plaintiff is entitled to damages of $7,045.20 plus interest.

Additionally, Plaintiff is granted judgment with respect to her claim for an equitable accounting (Count I), and, as to liability *only*, with respect to her claims regarding the California properties (Counts III, VIII, and IX). Plaintiff's motion for summary judgment is DENIED as to the remainder of her claims, which are for fraud (Count X), violation of the NYFCRA (Count XI), and unjust enrichment (Count XII), the last of which is the only count as to which Defendant's

motion for summary judgment is GRANTED.  Further, as discussed, Plaintiff shall show cause, **within two weeks** of this Opinion and Order and in a letter not to exceed five pages, why the Court should not dismiss her NYFRCA claim for lack of standing.  Defendant may file a response, not to exceed five pages, **within one month** of the date of this Opinion and Order.

Beyond that, the next step in this case is presumably trial.  That said, each party shall file a letter proposing next steps — and identifying any and all open issues for trial or otherwise — **within one month** of the date of this Opinion and Order.  The parties shall then appear on **September 12, 2024**, at **3:00 p.m.**, in Courtroom 1105 of the Thurgood Marshall United States Courthouse, 40 Centre Street, New York, NY 10007 for an **in-person conference** with the Court to discuss next steps and the possibility of resolving the case without the need for an ugly and painful trial.

Defendant's recently filed request for an eight-week continuance on medical grounds, *see* ECF Nos. 142-44; *see also* ECF No. 139, is denied.  For one thing, the documentation he submitted in support of the request (including the text of an e-mail purportedly from someone at "the ISS facility in Rome, Italy," which appears to have been copied and pasted into Defendant's submission) is not sufficient.[7]  For another, Defendant has one month to find someone (for example, a lawyer) who can assist him in proceeding from here.  To the extent that Defendant claims he cannot appear in person at the September 12, 2024 conference due to his condition or treatment, he must — **no later than the deadline to file his next-steps letter** — file declarations sworn under penalty of perjury from his treating physicians to substantiate that condition or treatment.  Any such declaration shall include the physician's telephone number and e-mail;

---

[7]     That would be true even if the Court were not suspicious given both Defendant's track record, discussed above, of forging documents and signatures and his belated production of unauthenticated e-mails that had not been found, let alone, produced by counsel.

further, the declarant or declarants should be prepared to testify at an evidentiary hearing if the Court concludes that such a hearing is warranted.  **To be clear: Unless and until the Court orders otherwise, Defendant shall appear in person at the September 12, 2024 conference. Failure to do so may result in sanctions, including the striking of Defendant's answer and entry of default judgment**.

The Clerk of Court is directed to terminate ECF Nos. 78, 97, and 103 and to mail this Opinion and Order to Defendant.

SO ORDERED.

Dated:  August 5, 2024
New York, New York

_____
JESSE M. FURMAN
United States District Judge